**UNITED STATES, Appellee,**

v.

**Private First Class Billy J. GREEN, 401–88–7268, United States Army, Appellant.**

**SPCM 20199.**

U.S. Army Court of Military Review.

30 May 1986.

For Appellant: Lieutenant Colonel Arthur L. Hunt, JAGC, Major Stephen R. Dooley, JAGC, Captain William T. Wilson, JAGC, Captain David L. Carrier, JAGC (on brief).

For Appellee: Colonel James E. Kucera, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, Major Thomas J. Leclair, JAGC, Captain Andrew D. Stewart, JAGC, Captain John F. Burnette, JAGC (on brief).

Before WATKINS, LYMBURNER, and SMITH, Appellate Military Judges.

## OPINION OF THE COURT

WATKINS, Senior Judge:

In accordance with his pleas, the appellant was convicted by special court-martial, military judge alone, of a total of six offenses under the Uniform Code of Military Justice [UCMJ], as follows: Charge I—Violation of Article 128, UCMJ, 10 U.S.C. § 928—(1) on 4 October 1983, unlawfully striking Private First Class William M. Purden on the head, shoulders and legs with his open hands and feet, (2) on 4 October 1983, unlawfully striking Private E2 Christian R. Fritz on the head with his open hand, (3) on 18 October 1983, unlawfully striking Private E2 Julio C. Arango on the head, and by choking, slapping and pushing him; Charge II—Violation of Article 134, UCMJ, 10 U.S.C. § 934—(1) on 4 October 1983, being drunk and disorderly in quarters, (2) on 18 October 1983, being drunk and disorderly in quarters; and Charge III—Violation of Article 92, UCMJ, 10 U.S.C. § 892—on 19 October 1983, violating a lawful general regulation, to wit: paragraph 6a(1)(a), 24th Infantry Division and Fort Stewart Regulation 600–4, dated 30 August 1983, by having alcohol in his system and on his breath during duty hours. Each of the specifications alleged that the situs of the misconduct was on the military installation at Fort Stewart, Georgia. The adjudged sentence extended to a bad-conduct discharge, confinement at hard labor for four months, and reduction to the grade of E–1. Based upon evidence of record which established that the accused is an alcoholic and that his offenses were all alcohol-related, the military judge recommended that the punitive discharge be suspended for a suitable period of time, provided that the accused (1) abstain from alcoholic beverages, (2) enroll in an Alcoholics Anonymous program, and (3) seek counseling for his alcoholism. The convening authority, in accordance with the sentence-limitation provisions of a pretrial agreement, approved the sentence, suspending until 20 March 1984, with provision for automatic remission, the adjudged confinement in excess of confinement at hard labor for three months.

Of concern to the Court are the findings of guilty of Charge III and its Specification, violation of a lawful general regulation "by having alcohol in his system and on his breath during duty hours." In order to better develop the competing legal positions of appellate counsel for the defense and the government, we directed that supplemental pleadings be filed in response to issues specified by the Court pertaining to the legality and enforceability of this regulatory provision. After carefully consider-

ing the entire record, to include the comprehensive and well-reasoned submissions of appellate counsel, we find that the regulatory proscription contained in paragraph 6a(1)(a) of 24th Infantry Division (Mechanized) and Fort Stewart Regulation 600–4 is essentially standardless and unreasonable. Accordingly, we decline to enforce it.

## I. FACTS

The factual predicate for the criminal allegations relating to the 18–19 October 1983 time frame is relatively simple and not in dispute. Pertinently, the following facts were established by means of a stipulation of fact:

> At approximately 2000 hours, 18 October 1983, the accused entered room A–315, Building 515, at Fort Stewart, Georgia. After entering the room and without any provocation, the accused began pushing PV2 Julio C. Arango around the room. The accused slapped PV2 Arango on the head several times and began choking him. The accused was stopped by PVT David Sasko and PFC Jack Jacquez. The accused was intoxicated and struck PV2 Arango without provocation. On 19 October 1983, the accused reported to the 0815 hour formation in front of the company orderly room at Fort Stewart, Georgia with a mug containing an alcoholic beverage. The Company Commander and 1SG both smelled alcohol on the accused's breath. A blood/Alcohol Test revealed a blood/alcohol level of 2.96 percent.

The accused amplified upon the foregoing facts during the course of the providence inquiry. With respect to the two 18 October 1983 offenses (Assault Consummated by a Battery upon Private Arango and Drunk and Disorderly in Quarters), the accused stated in effect that, because he was "drunk" that evening and "really didn't know what [he] was doing," he could not recall his prior activities but was convinced from witness statements that he did in fact unlawfully push, slap, strike and choke Private Arango and, separately, yell, scream and beat on doors, etc., as alleged.

Concerning the offense (Violation of a Lawful General Regulation) which allegedly occurred some hours later, on the morning of 19 October 1983, the underlying facts were developed during the following colloquy between the trial judge and the accused:

MJ: Okay, now, what happened on the 19th?

(The accused and his counsel talking in whispers)

ACC: That morning, sir, I—I woke up, and—I woke up and I started drinking. And—

MJ: Was the 19th a duty day?

ACC: Yes sir.

MJ: Okay.

ACC: And we was gonna have PT that morning, and I had a couple of drinks before I went to PT. And I went to PT, and I come back from PT, and I took a shower, and I started drinking again. And I drank about four or five drinks. And then I poured another one, and I said, "What the heck, you know, I'm already drunk," and I took my glass with me and I went to formation.

MJ: What do you mean, you took your glass and went to formation?

ACC: The glass with the drink in it, sir.

MJ: Okay, so that you had a drink in formation—standing there?

ACC: Well, sir, I poured it out, sir—you know, I slung it. And then I set it beside a little curb right beside where we had the formation.

MJ: Okay.

ACC: And then I got in the formation.

It seems clear that this latter evidence tends to establish, prima facie, a violation of one or more of the following well-known offenses under the Uniform Code of Military Justice: (1) Article 134 (Incapacitating Self for Performance of Duties Through Prior Indulgence in Intoxicating Liquor); (2) Article 134 (Drunkenness in Command, Quarters, Station, etc.); or (3) Article 112, 10 U.S.C. § 912 (Drunk on Duty). In this instance, however, the accused was not charged with a violation of any of these

venerable military offenses. Rather, in Charge III and its Specification, he was called upon to defend against an alleged violation of a recently promulgated installation regulation.[1]

## II. THE LANGUAGE AND SCOPE OF THE FORT STEWART REGULATION

The stated purpose of 24th Infantry Division (Mechanized) and Fort Stewart Regulation 600–4 [Fort Stewart Reg. 600–4] is "[t]o prescribe policy, procedures, and restrictions concerning the sale, purchase, possession, consumption, and control of alcoholic beverages on Fort Stewart/Hunter Army Airfield." The regulation is said to apply to all military and civilian employees serving at Fort Stewart and Hunter Army Airfield and, if violated, to have punitive effect. Insofar as military personnel are concerned, the regulation states that violations of para. 6a(1) are punishable under Article 92, UCMJ (Failure to Obey Order or Regulation) or under any of several other enumerated punitive articles.[2] In this context, each of these latter offenses has as an element of proof either drunkenness or incapacity. However, violations by military personnel of para. 6a(1) which are charged under Article 92, UCMJ are to be treated as "per se" offenses, in the sense that pleading and proof of impairment or incapacity are unnecessary. Interestingly, the regulation establishes a different rule for members of the civilian workforce, one which contemplates a nexus to duty performance. Civilian employees are prohibited from "[r]eporting for duty with sufficient alcohol in their system to interfere with the proper performance of duty, be a menace to safety, or otherwise be prejudicial to the maintenance of discipline." The regulation neither defines nor explains the phrase "in their system."

Turning to the substantive provision of the regulation in issue in this case, the cited paragraph reads as follows:

6.

PROHIBITED ACTIVITIES.

a.

Military Personnel.

(1)

Soldiers, except as provided in paragraph 8, below, are prohibited from:

(a)

Having any alcohol in their system or on their breath during duty hours.

Paragraph 5 of this regulation is titled "EXPLANATION OF TERMS." Subparagraph 5g thereunder reads as follows: "Alcohol in System. Figure 1 is a guide to be used by individuals to determine how long before reporting for duty they must refrain from consuming alcohol." Paragraph 8, captioned "AUTHORIZED ACTIVITIES INVOLVING THE CONSUMPTION OF ALCOHOLIC BEVERAGES," contains a list of nine "exceptions" to the general proscription, none of which is directly applicable to this case. It is noteworthy, however, that subpara. 8i provides that off-duty soldiers, and those "on leave, pass, training holiday, or otherwise absent from duty with proper authority" may consume alcoholic beverages except at certain designated locations.

## III. THE JUDICIAL PARAMETERS OF "REASONABLE" REGULATIONS

█ It is well settled that subject only to the paramount authority of the Constitution, an act of Congress, or the lawful order of a superior, a commander may lawfully regulate "[a]ll activities which are reasonably necessary to safeguard and protect the morale, discipline and usefulness of the members of a command and are directly connected with the maintenance of

---

1. 24th Infantry Division (Mechanized) and Fort Stewart Regulation No. 600–4 was published on 30 August 1983. It became effective on 1 October 1983, less than three weeks prior to the date of the alleged offense.

2. As listed in Fort Stewart Reg. 600–4, para. 6a(4), these punitive articles are: Article 112

(Drunk on Duty); Article 133, 10 U.S.C. § 933 (Conduct Unbecoming an Officer); Article 134 (Drunk in Command, Quarters, or in Uniform in Public Place under Service Discrediting Circumstances); Article 134 (Incapacitating Oneself for Performance of Duties through Prior Indulgence in Intoxicating Liquors).

good order in the [service]." *United States v. Martin*, 5 C.M.R. 102, 104 (C.M.A. 1952) (shipboard order prohibiting the bartering of cigarettes valid, even though it involved limitations on the transfer of private property, because it tended to discourage participation of American military personnel in black-market activities). *See also United States v. Nation*, 26 C.M.R. 504, 506 (C.M.A.1958); *United States v. Milldebrandt*, 25 C.M.R. 139, 142–43 (C.M.A. 1958); Manual for Courts-Martial, United States, 1969 (Revised edition) [MCM, 1969 (Rev.)], para. 171;[3] Department of the Army Pamphlet 27–9, Military Judges' Benchbook (May 1982), paras. 3–27*b* note 2, 3–28*b* note 3, and 3–29*b* note 2. Such authority can extend to orders and regulations affecting subordinate military personnel stationed abroad. *United States v. Manos*, 37 C.M.R. 274 (C.M.A.1967) (general order establishing a minimum drinking age for Naval personnel stationed in Japan was in conformity with local Japanese law and intended to reduce foreign prosecutions of United States servicemembers); *United States v. Lehman*, 5 M.J. 740 (A.F.C.M.R. 1978) (regulation prohibiting the importation of goods into Korea for personal gain or profit designed to assist in preventing blackmarketing); *United States v. Parker*, 5 M.J. 922 (N.C.M.R.1978) (general order requiring Naval personnel to obtain written approval from designated commander prior to getting married in the Philippines designed to assist such individuals with complexities of Philippine law and procedures). Private monetary dealings between servicemembers can also be regulated in some instances. *United States v. McClain*, 10 M.J. 271 (C.M.A.1981) (regulation prohibiting loans between trainees and permanent party personnel furthered legitimate military concern); *United States v. Giordano*, 35 C.M.R. 135 (C.M.A.1964) (regulation establishing maximum interest rates for loans among military personnel designed to promote morale and discipline by insuring that borrower does not become a tool of a harassing money-lender); *United States v. Hill*, 5 C.M.R. 665 (AFBR 1952) (regulation prohibiting members of the hospital staff from loaning money to, or borrowing from, patients intended to protect patients from those upon whom they must depend for proper care and treatment). A commander can also regulate certain activities affecting the health, safety and general welfare of the military community. *United States v. Cuffee*, 10 M.J. 381 (C.M.A.1981); *United States v. Hester*, 17 M.J. 1094 (A.F.C.M. R.1984); *United States v. Dykes*, 6 M.J. 744 (N.C.M.R.1978) (regulation prohibiting unauthorized possession of drug paraphernalia reasonably related to proper service objectives and responsibilities); *United States v. Leverette*, 9 M.J. 627 (A.C.M.R. 1980) (regulation governing registration and control of nongovernment-owned handguns and firearms necessary for safety and security reasons); *United States v. Chadwell*, 36 C.M.R. 741 (N.B.R.1965) (order requiring innoculation against certain diseases reasonably necessary to safeguard and protect members of the command). Such orders and regulations can even extend to matters of dress and appearance. *Goldman v. Weinberger*, — U.S. —, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (regulation which was applied to prohibit Orthodox Jew and ordained rabbi from wearing yarmulke while on duty and in uniform as commissioned officer in Air Force reasonably regulated military dress in light of need for uniformity); *United States v. Verdi*, 5 M.J. 330 (C.M.A.1978) (regulation prohibiting the use of wigs or hairpieces except to cover disfigurement or baldness not constitutionally infirm in the absence of a showing that the regulation is unrelated to

---

**3.** The Manual for Courts-Martial, United States, 1984 [MCM, 1984] states that a lawful order or regulation must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline and usefulness of members of a command and directly connected with the maintenance of good order in the service, and that such an order or regulation may not, without such a valid military purpose, interfere with private rights or personal affairs. MCM, 1984, part IV, paras. 14c(2)(a)(iii) and 16c(1)(c).

objective of promoting safety of persons and property).

■ The regulatory authority of a commander is not unlimited, however. Orders and directives which only tangentially further a military objective, are excessively broad in scope, are arbitrary and capricious, or needlessly abridge a personal right are subject to close judicial scrutiny and may be invalid and unenforceable. *United States v. Milldebrandt*, 25 C.M.R. 139 (C.M.A.1958) (order directing servicemember to report personal financial transactions while in leave status invalid on its face because it lacked specificity and was unrelated to a legitimate military requirement); *United States v. Smith*, 1 M.J. 156 (C.M.A.1975) (Naval regulation prohibiting all loans for profit between servicemembers without the consent of commanding officer illegal because it lacked standards and limits and failed to serve a corresponding military need); *United States v. Wysong*, 26 C.M.R. 29 (C.M.A.1958) (order prohibiting accused from speaking with men in company involved with on-going investigation of accused's family invalid since it was vague and indefinite and constituted an impermissible restriction on accused's freedom of speech); *United States v. Aycock*, 35 C.M.R. 130 (C.M.A.1964) (order prohibiting accused from contacting principal witnesses concerned with criminal charges against him illegal in that it unlawfully hampered defense preparation for pending judicial proceedings); *United States v. Nation*, 26 C.M.R. 504 (C.M.A.1958) (regulation, promulgated by Naval commander in Philippines, requiring six-month waiting period before application to marry alien would be considered for approval determined to be overbroad, unreasonable and unenforceable); *United States v. Wilson*, 30 C.M.R. 165 (C.M.A.1961) (in absence of circumstances showing its connection to military needs, order prohibiting the consumption of alcoholic beverages without limitation as to time or place held so broadly restrictive of private rights as to be arbitrary and illegal); *United States v. Wahl*, 4 C.M.R. 767 (A.F.B.R.), *pet. denied*, 4 C.M.R. 173 (C.M.A.1952) (written order not to indulge in alcoholic beverages during specified period of restriction invalid since the evidence failed to establish that any military duty or act was involved).

## IV. ANALYSIS OF THE FORT STEWART REGULATION

### A. Prohibition Against Having Any Alcohol in One's System

■ Strictly construed, the first prong of the substantive provision in issue in this case, which prohibits soldiers from "[h]aving any alcohol in their system ... during duty hours," is so broad as to encompass otherwise innocent conduct. It is a matter of common knowledge, for instance, that many nonprescription cough medicines, elixirs, and mouthwashes contain significant percentages by volume of alcohol.[4] Moreover, the absolute nature of this proscription means that no Fort Stewart soldier—neither one responsible for the successful accomplishment of discretionary and highly technical functions nor one assigned to perform more routine, physical-type tasks—could lawfully report for duty with so much as a single drop of alcohol "in [his] system." To do so would subject such an individual to criminal sanctions far more severe than those which would be applicable if the soldier, in off-duty status, had actually become inebriated on alcohol in barracks or, as the result of prior indulgence in intoxicating liquor, had fallen into a drunken stupor and thereby rendered himself or herself completely unfit for the performance of assigned duties.[5] Indeed,

---

4. We are not unmindful of the line of cases which indicates that a facially vague or overbroad regulation may be salvaged by reading into it a scienter or mens rea requirement. *See e.g., United States v. Cannon*, 13 M.J. 777 (A.C.M.R.), *pet. denied*, 14 M.J. 226 (C.M.A.1982); *United States v. Bradley*, 15 M.J. 843 (AFCMR), *pet. denied*, 17 M.J. 89 (C.M.A.1983). However, as developed in the body of the instant opinion, Fort Stewart Reg. 600–4 is flawed in other legally significant respects as well.

5. The maximum authorized punishment for the Article 134 offense of Drunk in Quarters is confinement for one month and forfeiture of two-

if an alleged violation of para. 6a(1) of Fort Stewart Reg. 600–4 were charged under Article 92, UCMJ (Failure to Obey Order or Regulation) and referred for trial by general court-martial, the putative punishment could be roughly twice that officially sanctioned for the Congressionally-defined and more widely recognized offense of Drunk on Duty.[6]

An examination of Congressional and Executive sanctions relating to the consumption of alcoholic beverages by military personnel reveals an underlying awareness that intoxication and impairment can adversely impact upon duty performance. Quite logically, therefore, existing statutory and regulatory proscriptions are concerned principally with the negative operational ramifications of overindulgence, rather than with the fact of ingestion itself. *See e.g.,* the offenses listed at note 2, *supra.* A recent Department of the Army regulatory change reflects a shift towards a "per se" criterion of impairment but does not alter the general policy condoning a modest blood-alcohol level if duty performance is otherwise unaffected. In its revised form, Army Regulation 600–85, Alcohol and Drug Abuse Prevention and Control Program, para. 1–9.1 (Interim Change I03, 29 Apr. 1983) provides:

*Alcohol impairment.* Military personnel on duty shall not have a blood alcohol level of .050% (milligrams of alcohol per 100 milliliters of blood) or above. Any violation of this provision provides a basis for disciplinary action under the UCMJ and a basis for administrative action, to include the characterization of discharge. Nothing in this regulation shall be interpreted to mean that impairment does not exist if the blood alcohol level is less that [sic] .050%. To be in violation of this provision, a service member must have known or should reasonably have known prior to becoming impaired that he or she had duties to perform.

Not only does this Department of the Army proscription contain a threshold blood-alcohol level (0.050%) below which impairment and intoxication are subject to traditional modes of pleading and proof, it contains a significant due-process safeguard in the form of a "knowledge of duty" element of proof.[7]

Fort Stewart Reg. 600–4, on the other hand, in effect prohibits the ingestion of alcohol not only during periods of duty but for an undetermined and unspecified period prior thereto.[8] It disdains any concern

thirds pay per month for one month. For the Article 134 offense of Incapacitating Self to Perform Duties through Prior Indulgence in Intoxicating Liquor, it is confinement for three months and forfeiture of two-thirds pay per month for three months. MCM, 1969 (Rev.), para. 127*c*; MCM, 1984, part IV, paras. 73e(2)(b) and 76e, respectively.

**6.** The Article 92 offense of Failure to Obey Order or Regulation is punishable by a dishonorable discharge, confinement for two years, and forfeiture of all pay and allowances. For the Article 112 offense of Drunk on Duty, the maximum punishment at a general court-martial is a bad-conduct discharge, confinement for nine months, and forfeiture of all pay and allowances. MCM, 1969 (Rev.), para. 127*c*; MCM, 1984, part IV, paras. 16 and 36, respectively. At a special court-martial, as here, the maximum punishment for each of these offenses is a bad-conduct discharge, confinement for six months, and forfeiture of two-thirds pay per month for six months. Rule for Courts-Martial 201(f)(2)(B)(i). The maximum imposable sentence could also be affected by the punishment-

limitation provisions pertaining to orders and regulations set forth in the Manual for Courts-Martial. MCM, 1969 (Rev.), para. 127*c* n. 5; MCM, 1984, part IV, para. 16e(2).

**7.** Army Regulation 600–85, para. 3–20 (Interim Change I03, 29 Apr. 1983) contains additional safeguards in that: (1) if the alcohol breath measuring device results are to be used in disciplinary or administrative proceedings, the operator must be certified; (2) certification training should be in accordance with Appendix E, Army Regulation 190–5; and (3) the installation is responsible for the certification of operators. None of these protections are found in Fort Stewart Reg. 600–4.

**8.** According to Figure 1 of Fort Stewart Reg. 600–4, a soldier weighing between 100 and 200 pounds who consumes a single "drink" (nature and exact quantity of which not specified) will, even after four hours, still have at least a trace of alcohol in his or her blood. The regulation provides no guidance as to when, if ever, all traces of alcohol will disappear from the drinker's bloodstream and other "systems" of the

with, or attention to, the question of whether the quantity involved is such as to impact adversely upon duty performance. This regulation purports to make criminally punishable the fact of alcohol in the "system" of a soldier, irrespective of whether the quantity involved is so great that intoxication or impairment is practically certain to result or so small that its physical presence can scarcely be detected.[9] In declaring unlawful an absolute-type order "not to drink liquor," Chief Judge Quinn, writing for a unanimous Court of Military Appeals a quarter-century ago, noted the following: "It is also significant that by its terms the order made no exceptions. A single drink of beer would violate the order as definitely as the consumption of a fifth of whiskey." *United States v. Wilson,* 30 C.M.R. 165, 166 (C.M.A.1961); *see also United States v. Wahl* 4 C.M.R. 767, 770–71 (A.F. B.R.), *pet. denied,* 4 C.M.R. 173 (C.M.A. 1952).

The lack of a "knowledge" element of proof means that the Fort Stewart soldier who, after consuming beer or wine with his evening meal, receives an official telephone call to report for duty with his unit as a part of an operational alert would be faced with the following Hobson's choice: (1) report for duty and thereby violate the installation alcohol regulation, or (2) refuse to report for duty and thereby become liable to punishment for failure to repair or disobedience of an order.[10]

■ To be judicially enforceable, a local regulation must not be arbitrary or unreasonable and it cannot conflict with or detract from the scope or effectiveness of Department of the Army provisions on the same subject. *See United States v. Garcia,* 21 M.J. 127 (C.M.A.1985); *United States v. Cowan,* 47 C.M.R. 519 (A.C.M.R. 1973). In the instant case, it is apparent that, pertinently, Fort Stewart Reg. 600–4 is virtually irreconcilable with Army Regulation 600–85, the relevant proscription of which was disseminated worldwide by Headquarters, Department of the Army some six months prior to the effective date of the local regulation.

## B. Prohibition Against Having Any Alcohol on One's Breath

The second substantive prong of paragraph 6a(1)(a) of Fort Stewart Reg. 600–4, prohibiting soldiers from "[h]aving any alcohol ... on their breath during duty hours," constitutes an equally objectionable legal criterion. The unreliability of "alcohol breath" as an indicator of the alcoholic state of an individual is well recognized in medical literature. The following excerpt

---

body. Another, non-punitive, Army Regulation provides that individuals (aircrew members and others involved in the flight operations of aircraft, including air traffic controllers) will be restricted from flying duties for "12 hours after last drink consumed and until no residual effects remain." Army Regulation 40–8, Temporary Flying Restrictions Due to Exogenous Factors, para. 4a (17 Aug. 1976). Although a restriction of this nature may be necessary to ensure safety in flight, we do not suggest that it should be applicable to all soldiers. We cite this provision merely as an indication that it is generally recognized that alcohol lingers in the drinker's blood for a considerable period of time after it is ingested. *Cf.* Murray v. Haldeman, 16 M.J. 74, 80 (CMA 1983) (even when a servicemember uses a psychoactive drug in private while he is on extended leave far away from any military installation, that use is service-connected if he later enters a military installation while subject to any physiological or psychological effects of the drug). In this connection, we note (1) that the subject-matter jurisdiction holding in Murray v. Haldeman is focused upon the effects of drug use in the context of duty performance and installation security, rather than upon the fact of drug use itself, and (2) that the requirement that a servicemember be "fit for duty" when he or she returns from leave is not an unreasonable one under circumstances in which that member knows exactly when the leave is to terminate.

9. The absence of a threshold blood-alcohol level from Fort Stewart Reg. 600–4 is highly significant from an evidentiary point of view. To illustrate, a showing of a blood-alcohol level of 0.001%, for example, would have little or no evidentiary significance for prosecution purposes with respect to Army Regulation 600–85 but would ostensibly constitute a legally sufficient, if not irrefutable, case in the context of Fort Stewart Reg. 600–4.

10. See the discussion of the lingering effect of alcohol in the blood at note 8, *supra.*

from Gray's *Attorneys' Textbook of Medicine* effectively illustrates the point:

> In dealing with all alcoholic beverages the component of concern with respect to sobriety is ethyl alcohol. Although it is one of a large category of compounds chemically known as alcohols, this particular alcohol is the intoxicating element in all alcoholic beverages. In its pure form, it is a colorless limpid fluid with a powerful burning taste but with relatively little odor. The latter fact is of particular interest in view of the observation commonly reported as evidence of intoxication that the breath had a strong odor of alcohol. The presumption of such evidence is that the odor of the lung air reflects the magnitude of alcohol in the circulating blood. Actually, the concentration of alcohol in the breath coming from the lungs, even in the most extreme states of intoxication, is so low as to be barely detectable to the smell. Even in alcoholic coma the concentration of alcohol in the blood is less that 1 per cent, a concentration of alcohol whose odor would be undetectable if placed in an open vessel outside the body. What one smells on the drinker's breath are the aromatic materials which give to each type of beverage its characteristic odor; one may recognize a beer, wine, gin, or other beverage odor—but not an alcohol breath. While alcohol rapidly disappears from the mouth after ingestion, the aromatic materials of the beverages, like those in other foods, linger and are detectable for a relatively long time. *The breath odor after drinking is, therefore, unrelated to the alcohol content of the blood and is a poor indicator of the alcoholic state of the individual.*

Gray, *Attorneys' Textbook of Medicine*, Sec. 133.10 (3d ed. 1983) (emphasis added).

## V. CONCLUSION

For the foregoing reasons, we conclude that the regulatory proscription contained in paragraph 6a(1)(a) of Fort Stewart Reg. 600–4, which prohibits Fort Stewart soldiers from "[h]aving any alcohol in their system or on their breath during duty hours," is invalid and unenforceable. More specifically, we hold that this locally-promulgated proscription is essentially standardless, arbitrary, and unreasonable, and that it serves no corresponding military need not better satisfied by statutes and regulations of greater legal dignity.

The findings of guilty of Charge III and its Specification (Violation of Lawful General Regulation) are set aside. Charge III and its Specification are dismissed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted and the entire record, the sentence is affirmed.

Judge LYMBURNER and Judge SMITH concur.