**UNITED STATES**

v.

**Timothy S. ROACH, Seaman, U.S. Coast Guard.**

**CGCM 9992.**
**Docket No. 887.**

U.S. Coast Guard Court of Military Review.

29 June 1988.

Trial Counsel and Appellate Government Counsel: CDR Terrance M. Edwards, USCG.

Assistant Trial Counsel: Lt. Kathleen M. Curley, USCG.

Detailed Defense Counsel: LCDR J.J. Vallone, USCG.

Assistant Defense Counsel: LCDR Michael J. Devine, USCG.

Appellate Defense Counsel: LCDR Robert Bruce, USCG.

En Banc.

## DECISION

BARRY, Judge:

Appellant was charged with disobedience of an order by a superior commissioned officer, in violation of Article 90, Uniform Code of Military Justice, 10 U.S.C. § 890; damaging government property, in violation of Article 108, Uniform Code of Military Justice, 10 U.S.C. § 908; willfully hazarding a vessel, in violation of Article 110, Uniform Code of Military Justice, 10 U.S.C. § 910; and arson, in violation of Article 126, Uniform Code of Military Justice, 10 U.S.C. § 926. Appellant pled guilty to the violations of Articles 90 and 110 of the Uniform Code of Military Justice. Pursuant to a pre-trial agreement the charges of violations of Articles 108 and 126, Uniform Code of Military Justice were withdrawn with prejudice. Appellant was sentenced by the military judge to a bad conduct discharge, confinement for thirty months, total forfeitures, and reduction to pay grade E-1. The convening authority approved the findings and, pursuant to the pre-trial agreement, approved only so much of the sentence as provides for a bad conduct discharge, confinement for sixteen months, total forfeitures, and reduction to pay grade E-1. The convening authority also ratified the understanding expressed in the accused's offer to plead guilty, that pretrial confinement would be credited day for day against the sentence. On the day sentence was adjudged, the accused had been in pretrial confinement 92 days.

Before this Court, five errors have been assigned:

1. Assignments I and III above, were directed by order of this Court. The latter order, following a notice of appearance before this Court by the trial defense counsel as appellate counsel, also required the detailing of an appellate defense counsel not involved in the trial. As in *United States v. Slocumb*, 24 M.J. 940 (C.G.C.M.R.1987), we were convinced that when a case is disposed of at the trial level through guilty pleas entered pursuant to a pretrial agreement negotiated by

## I

APPELLANT'S PLEA OF GUILTY TO VIOLATING ARTICLE 90, UCMJ, WAS IMPROVIDENT BECAUSE THE COMMAND "TO NOT CONSUME ALCOHOLIC BEVERAGES" IS NOT A LAWFUL ORDER,

## II

IF THIS COURT DEPARTS FROM PRECEDENT AND FINDS THAT THE ORDER WAS LAWFUL IT SHOULD NOT APPLY THAT FINDING RETROSPECTIVELY TO APPELLANT BECAUSE THAT WOULD DEPRIVE APPELLANT OF DUE PROCESS,

## III

APPELLANT'S PLEA OF GUILTY TO VIOLATING ARTICLE 110, UCMJ, WAS IMPROVIDENT BECAUSE SETTING A FIRE ON A VESSEL AT BERTH DOES NOT CONSTITUTE AN OFFENSE UNDER THAT STATUTE,

## IV

THE MILITARY JUDGE'S FAILURE TO ADEQUATELY QUESTION APPELLANT AND HIS COUNSEL CONCERNING A STATEMENT CONTAINED IN THE PRETRIAL AGREEMENT THAT APPELLANT REQUESTED TRIAL BY MILITARY JUDGE ALONE RENDERED HIS PLEAS OF GUILTY IMPROVIDENT, [AND THAT]

## V

A PUNITIVE DISCHARGE IS AN INAPPROPRIATELY SEVERE PUNISHMENT FOR APPELLANT.[1]

## STATEMENT OF FACTS

Seaman Roach had been a crew member of the USCGC DEPENDABLE (WMEC

the trial defense counsel, countervailing considerations weighing against detailing the trial defense counsel as appellate counsel should prevail. It is asking too much of trial defense counsel to expect that officer, as appellate counsel in the case, to independently review the pretrial negotiations, plea bargain and providence inquiry with a view to challenging some aspect of those proceedings at the appellate level.

626) from October 1984. In early 1985 he was counselled on at least three occasions resulting from his returning to the ship in an intoxicated condition. A service record entry (Page 7 Administrative Remarks entry) in February 1985 advised him that his conduct to date was considered to be his first alcohol related incident, and advised Seaman Roach that a second incident would be grounds for separation under the provisions of Chapter 20 of the Coast Guard Personnel Manual. In April of 1985 he was screened by the Counseling and Assistance Center (CAAC) at the Naval Air Station Pensacola, Florida to evaluate the extent of his alcohol abuse. As a result, it was recommended that he attend mandatory Alcoholics Anonymous meetings (which, as far as can be ascertained by the record, he did not attend). He was placed on a supervised antabuse program, and he subsequently attended Level II Substance Abuse counseling from 3 to 28 June, which reportedly resulted in improvement in his performance and attitude (page 7 Service Record entry on 17 July 1985). In August of 1985, while the DEPENDABLE was in Key West, Florida, Seaman Roach was arrested by civil authorities in connection with his consumption of alcohol, an incident which involved Roach's assault on a police officer. Another page 7, Service Record entry on 17 August advised him that his actions in Key West violated his Alcohol Abuse Aftercare Plan, were considered his second "alcohol incident", and that because he had not shown he was "making a sincere effort to overcome ... [his] alcohol abuse problem" he was therefore being recommended for discharge.

Seaman Roach subsequently absented himself from the ship without authority from 13 September 1985 until 17 September 1985. He returned to the ship after a telephone conversation between the commanding officer and Seaman Roach's father. He accompanied the vessel on its next patrol. It was anticipated that a message authorizing his discharge would be received during the course of that patrol. On 30 September 1985, while on patrol, the commanding officer awarded Seaman Roach 30 days restriction, and 5 days extra duty for the above mentioned absence without leave. The commanding officer suspended the restriction for 3 months, and told Seaman Roach that he would be permitted to go on liberty during the forthcoming one night patrol layover in Key West, Florida, but that he was not to consume alcohol. The record is not clear whether this order was given during the Mast Proceedings or some time thereafter. The DEPENDABLE arrived in Key West on 8 October 1985. Seaman Roach went on liberty and consumed alcohol during the afternoon and evening. He returned to the ship shortly after midnight on 9 October 1985 and set fire to the paint locker which contained numerous inflammable contents. Within minutes Seaman Roach inquired of another crew member whether the latter smelled smoke. They then proceeded to alert the persons on board and sounded the alarm. The fire was eventually extinguished with relatively minor damage (approximately $1100) having been incurred. DEPENDABLE'S resumption of patrol was slightly delayed. The message authorizing Seaman Roach's administrative discharge was received by the commanding officer later on the same day the fire was set, 9 October 1985.

## LEGALITY OF THE ORDER

█ Appellant challenges the legality of the order "not to consume alcoholic beverages." While an order from a superior commissioned officer requiring the performance of a military duty or act may be inferred to be lawful, such an inference does not apply to a patently illegal order, or to an order which does not relate to a military duty. [Para. 14c(2)(a), Part IV, Manual for Courts–Martial, 1984].

An order to refrain from consuming alcoholic beverages is not patently illegal, and may be legal. *United States v. Wahl*, 4 C.M.R. 767, 771 (A.B.R.1952). Other opinions of military courts and boards dealing with orders to abstain from drinking alcohol have, however, found such orders illegal and unenforceable. *United States v. Wilson*, 12 U.S.C.M.A. 165, 30 C.M.R. 165 (1961); *Wahl, supra.* In *Wilson*, the order

from the appellant's squadron commander was "not to drink liquor". Appellant had confessed to stealing a tape recorder while under the influence of alcohol. He was then restricted to his place of duty and the barracks. The squadron commander testified that the order not to drink was given "for his own good ... for his protection and the best interests of the service," and to "prevent something similar ... happening again" (30 C.M.R. at 166). The court found the order was not limited to refrain from drinking while on duty and in the barracks, but rather applied in all places and on all occasions. Judge Quinn wrote "[i]n the absence of circumstances tending to show its connection to military needs, an order which is so broadly restrictive of a private right of an individual is arbitrary and illegal." *Id.* at 166, 167. Judge Latimer, dissenting in part but concurring that the order was illegal, wrote, "While the commander who ordered accused to abstain from consumption of alcoholic beverages apparently did so out of paternalism, nevertheless the order was so broad so to be illegal." *Id.* at 167.

The same result was reached in *United States v. Wahl, supra,* where the order to a restricted officer was that "[d]uring the period of this restriction you are not to indulge in alcoholic beverages." 4 C.M.R. at 770. Appellant was convicted of drinking at the base Officer's Club (which was within the bounds of the restriction) in violation of this order. The Army Board of Review stated, "... the accused, in company with others of officer rank, was in a recognized base activity after normal duty hours. It was obvious ... that no military duty or act was involved. In the opinion of the Board the presumption of legality of the order was overcome." 4 CMR at 771. In reaching this conclusion, the Board did note that "the order must relate to a military duty.... What constitutes a military duty is dependent upon the circumstances of each case. An order prohibiting drinking of intoxicating beverages while on duty is certainly legal (CM 302885, Payne, 59 BR 133) and there are many other situations in which such an order would be legal." 4 C.M.R. at 770, 771. However, this was not

such a situation, for "[i]t appears that the order, in effect, directed accused not to commit an offense (drunkenness in public), or, at least directed him not to place himself in a position where he would be tempted to commit that offense or a similar one. Under the circumstances of this case, the Board is of the opinion that such an order is illegal." *Id.*

The legality of the order in the case at bar must be analyzed in terms of the particular and peculiar circumstances. In addition to the facts set forth above, several other facts should be noted. Seaman Roach was, of course, an alcoholic, well known by the command to do irrational things when intoxicated (although all witnesses agreed he would never do such irrational things—including the offenses charged—if not drinking). He was also known to have had more than the usual amount of difficulty adjusting to the ship, and had been subjected to some more than normal degree of hazing or joke playing by the crew, and indeed, perhaps had been the victim of some inadvertent comments by the wardroom as well (CO's testimony, R. 316).

While he was AWOL, a telephone conversation concerning his return took place between his father and the Commanding Officer. During the telephone conversation, Seaman Roach's father indicated to the CO that his son had talked of suicide. They discussed the need for professional counselling and assistance to address Seaman Roach's "longstanding problem", and the CO indicated that he would arrange for "him to be seen by some professional counsellors and doctors if necessary" (CO's testimony, R. 314). The father's stipulated testimony is more certain. He stated:

He [my son] told me he hated the ship and would commit suicide before he would go back. I took this quite seriously, since my older son had once attempted suicide. I personally telephoned the DEPENDABLE's Commanding Officer, ... and spoke with him for over one hour. I remember the conversation vividly. We discussed Tim's mental state and possible solutions to the AWOL and

Tim's fears about returning to the ship. [The Commanding Officer] ... verbally assured me that if Tim returned to the ship he would receive only captain's mast. He also promised that if Tim returned, he would not go on another patrol and that Tim would get an immediate psychiatric evaluation.

Defense Exhibit "A".

Seaman Roach did return; however, he did not receive a psychiatric evaluation, and he did make the next patrol. It was during this patrol that he received the captain's mast, the restriction was awarded and suspended, and the incident occurred.

The amount of attention paid to alcohol awareness in the Coast Guard has been on the increase, and norms for Command awareness and involvement have been increasing while the willingness to tolerate alcohol abuse by members has been decreasing. The Personnel Manual, COMDTINST M1000.6, which we judicially note, has reflected a changing norm. The policy promulgated when the manual was first published (5 May 1982) addressed the subject of alcohol abuse, and imposed requirements on commanding officers to educate all personnel, particularly supervisors, concerning alcoholism, with a view toward self identification or medical referral (Article 20–A–4b). It contained discussions on rehabilitation and treatment (Article 20–A–5), pointing out that alcoholism is an "extremely complicated illness", with no known cure, but one which can be treated and arrested with "multifaceted" treatment, "encompassing the physical, sociological and psychological aspects of the disease" (Article 20–A–5a). It, however, addressed post-treatment observation and disposition only in general terms (which did not address either aftercare plans or the command's responsibility to cooperate or assist in the member's efforts to remain sober, which appeared in the next revision).

Less than a year later, on 18 January 1983, in Change 3 to the Personnel Manual, this policy section of the Manual was completely rewritten. The definition of alcoholism was amended to include the phrase "[a] diagnosable disease" (Exhibit 20–A–1d), and the concept of a "Recovering Alcoholic" was set forth (Exhibit 20–A–1r), in place of the term "Recovered Alcoholic" (former Article 20–A–2m), without any change to the definition, which stated "a person whose alcoholism has been arrested through abstinence and whose sobriety is maintained through a continuing personal program of recovery". It imposed specific duties on commands. It introduced the concept of "Aftercare" (Article 20–A–2a), and required that "[f]or those members who will be retained, the command shall implement an aftercare plan." (Article 20–C–7d). The required plan had certain minimum mandatory requirements:

(1) A minimum one year evaluation of performance of duty....

(2) The member is to abstain from all use of illegal drugs and/or alcohol

(3) The member must attend Alcoholics Anonymous ... meetings....

(4) The member must be placed on a supervised antabuse program....

(Article 20–C–7d)

Finally, this change included, in an exposition of available resources, a discussion of Alcoholics Anonymous, and noted special contacts available for members stationed aboard ship or on isolated duty. (Article 20–D–4g). It was this 18 January 1983 change and these procedures which were in effect during the period in question.[2]

In this case, Seaman Roach was, after completing the Level II Substance Abuse counselling, placed on an aftercare program with supervised antabuse treatments, pursuant to the above Personnel Manual provision. These antabuse treatments lasted from July to October, according to the ship's corpsman responsible for administering the program. The corpsman also testified concerning his administration of the program, which could categorize as somewhat "relaxed", and that he often did not observe whether Seaman Roach actually

---

**2.** The development of the policy continued, and another complete change to the Personnel Manual, further expanding and strengthening the program, took effect soon after the events here in question.

consumed the antabuse pills. He testified he believed Seaman Roach drank during the period. (R. 217–220). He also testified Roach was required, as part of the written aftercare program, to attend AA meetings. It appears, however, that no such meetings were ever attended, and that this portion of the mandatory aftercare program was not monitored by the command. When the incident involving alcohol and an assault on a policeman occurred in Key West on August 17, 1985, the response of the command was to initiate discharge procedures. There was no apparent change to the aftercare program or to the command's handling of that program, and, as noted in the testimony of the corpsman, it appears that no part of the aftercare program was carried out after this date except possibly the antabuse program, but the effectiveness of this part seems limited in view of the events reflected in the charges.

When Seaman Roach returned from being AWOL (after the above mentioned phone call), the commanding officer indicated he "had planned to have him seen", but that Tyndall Air Force Base "could not accommodate us" (R. 328, 329). He apparently ruled out two other options, Bay Medical and Eglin Air Force Base, (R. 315) and elected to "do nothing and provide some counselling and observation, wait and see kind of an approach once he was on board". (R. 329) Ultimately he counselled Roach and advised him that he would not be severely punished at captain's mast, and laid the matter in his (Roach's) hands: "We ... [have] this facility in town, Bay Medical Center, they can handle this under an emergency basis. I told your father we could make that available to you. What do you think, what do you want to do"? (R. 330). Some "counselling" between Roach and the CO and XO then transpired, culminating as follows:

> He seemed comfortable with the idea of being on the ship, making the shortened version of the patrol, or basically the three, four weeks maximum. He felt comfortable with the fact particularly after *I pointed out to him at sea you don't have access to alcohol, you do have access to people who have experi-*

*ence of the counselling of people,* and he seemed comfortable at that time, and I asked him very pointedly "Do you feel as though you have to go to Bay Medical Center today or tomorrow or this week before we sail," and he said no. He said he felt he could handle it.

(R. 331, 332 Emphasis supplied).

Roach did stay on the ship and made the patrol. During the trip the mast was held and he was awarded 30 days restriction, but the restriction was suspended and Roach was authorized liberty in Key West, with an admonition (order), in terms not altogether clear, given either at the mast or sometime within a few days thereafter, not to consume alcoholic beverages while in Key West.

We have gone to some lengths to set forth the detailed facts and circumstances which bear on the question of the legality of this order not to consume alcoholic beverages. We are convinced, under all the facts and circumstances, that the order cannot and should not be enforced.

We believe the order cannot be enforced, because, like Judge Quinn in *Wilson,* we are unable to find an adequate connection to a military duty to justify our enforcement of this order. The government contends the connection is adequately provided by virtue of the *CARE* inquiry. The military judge was aware of the potential defense of unlawful order. He queried the defense counsel as to whether there was an issue as to the lawfulness of the order on two occasions (R. 23, 49). On the second occasion, the questioning related to the appellant's abuse of alcohol, his treatment, and the aftercare program. The comments between defense counsel and the military judge seem to imply that the absence of an issue concerning lawfulness of the order hinges on the existence or requirements of the aftercare program (R. 48 and 49). Nevertheless, the military judge inquired further of the appellant as follows:

> Q. What justification if any do you see in the order for not drinking in Key West?

A. I got arrested in August of 1984 by assaulting a police officer for being drunk and disorderly. Later it was brought down to simple battery. This was in Key West before he issued these orders so he knew that the next time I was in Key West the last patrol I was there he wanted to make sure I would not get in trouble again in Key West, Your Honor.

Q. And that would be a concern for you personally then in relation to the civil authorities in Key West?

A. I think it also could be a case for the Coast Guard also because it also puts a blemish mark on the Coast Guard with the civilian authorities. So the Coast Guard Cutter DEPENDABLE has sort of a bad name in Key West and he wanted to make sure it didn't have another bad name again.

(R. 50).

Paragraph 14c(2)(a)(iii), Part IV, Manual for Courts–Martial, 1984 provides:

"(iii) *Relationship to military duty.* The order must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service. The order may not, without such a valid military purpose, interfere with private rights or personal affairs."

Even in this era of heightened awareness of society's need to address alcoholism and the abuse of alcohol, most would still consider that an order "not to consume 'alcohol' " interferes with private rights or personal affairs. Nevertheless, such an order may still be lawful if it serves a valid military purpose. The issue is whether one or more of those reasons stated in the first sentence of the above-quoted provision of the Manual for Courts–Martial, or any other valid purpose, is served here. We think not. The purpose intended to be served here is remarkably similar, though perhaps somewhat less paternalistic, than the purpose intended to be served in *Wilson, su-*

*pra,* which was *"for his own good ... for* his protection and the best interests of the service."* and to *"prevent something similar ...* happening again" (30 C.M.R. at 166, emphasis supplied), and in which Judge Quinn found an absence of circumstances tending to show a connection to a military need. Under all the circumstances set forth above, we find a similar absence here.

Even if we were not able to find the lack of a valid military purpose, we would be generally troubled by this order. The Personnel Manual provisions, particularly the aftercare program, are designed to assist the member toward rehabilitation. Here the requirements of that program were partly ignored, with the administration of the remainder lax, at best. The incident in Key West occurred, soon followed by the AWOL and the return of Roach. Thereafter, the commanding officer (1) induced Roach to make the next patrol violating his assurance to the father, and (2) chose to do his own "counselling" rather than obtaining professional counselling and evaluation in violation of his assurance to the father and the clear need for professional assistance stated in the Personnel Manual. When the commanding officer induced Roach to make the patrol, he did so by noting that he would not have access to alcohol. Then he suspended the restriction and granted Roach liberty in a port where he had a history of becoming drunk and disorderly. As Roach recalled during the plea providence inquiry, "he told me I should not consume alcoholic beverages, that he was going to let me go on liberty in Key West to have the *full temptations* as everybody else aboard the ship but he did not want me to drink." (Emphasis supplied). It should have been no surprise that Roach drank on this occasion—indeed, it was probably clearly forseeable. We conclude that the use of a direct order not to drink alcohol is an unjust and unreasonable mechanism to achieve the commanding officer's goals in circumstances such as these where patently legal and decidedly more effective methods were available to the commanding officer and were specifi-

cally rejected (*e.g.*, those provided for in the Personnel Manual, and the simple remedy of not suspending the restriction in Key West, thus making good on his promise that while on patrol, liquor would not be available).

For all these stated reasons we are unable to affirm that this finding is "correct in law and fact and ... should be approved." Article 66(c), Uniform Code of Military Justice, 10 U.S.C. § 866(c). Based on all the above, we also conclude that the plea of Guilty to violation of Article 90 was improvidently entered and accepted. The finding to this charge and specification must be set aside and the sentence reassessed.

## REMAINING ASSIGNMENTS

■ Chief Judge Baum, in his concurring opinion, has addressed the question of the legality of charging arson aboard a vessel as "hazarding" in violation of Article 110, and we concur with his conclusion that such a charge remains valid. As is he, we are troubled with the result which is reached in a case such as this. Even when such a case is referred as non-capital, the accused is forced to defend against an offense carrying the maximum punishment short of death—life imprisonment. This fact will influence both the accused and his counsel in any efforts to achieve a pre-trial agreement. The maximum sentence will also influence the finder of fact in reaching a sentence to award. In both aspects, the high maximum sentence works to the detriment of the accused. As Chief Judge Everett recently noted in a general court-martial where there was a pre-trial agreement for a sentence which could have been awarded by a special court-martial:

In the first place, the very fact that a case has been referred to a general court-martial tends to elevate the sentence that will be imposed in the event of conviction, because logically the sentencing authority will consider the maximum punishment in deciding what sentence to adjudge. If the charges against Murray had been referred to a special court-martial, which could have imposed no more

than a bad-conduct discharge, 6 months' confinement, partial forfeitures, and reduction to pay grade E–1, the sentence adjudged might have been much less than was rendered by the general court-martial—where the maximum punishment authorized was a dishonorable discharge, 5 years' confinement, total forfeitures, reduction to E–1, and a fine. In short, sentencing authorities—whether, as here, a military judge or, as in other cases, members—tend to take into account the maximum sentence imposable in deciding what sentence actually should be adjudged.

*United States v. Murray*, 25 M.J. 445, 455, 456 (C.M.A.1988) (Everett, C.J., concurring in part and dissenting in part) (Footnote omitted).

The reasoning seems to be applicable to cases such as this where an accused faces more serious punishment. No one would dispute the seriousness of setting a fire aboard a vessel. There were available, however, lesser offenses such as aggravated arson under Article 126, which was charged, but then withdrawn pursuant to the pre-trial agreement. Such a charge, with a 20 year maximum sentence, appears more than adequate to address a situation such as this where the vessel is moored, where there are no personnel casualties, where material damage is under $1200, and where the mission of the vessel is not affected except for a very slight delay in departure. The record in this case does not disclose any clear basis either to confirm or deny our concern regarding the question of the possible effect of the more serious punishment on both pre-trial negotiations and on sentencing. We conclude, however, that further proceedings to resolve such issues would be inappropriate, and in the interest of justice, we resolve our concern by an appropriate reassessment of the sentence.

■ In reviewing the assignment of errors, we have agreed with the first, thus mooting the second and have rejected the third and fourth. We agree with the last assignment. Accordingly, the findings of guilty to Charge I, violation of Article 90, Uniform Code of Military Justice, and the

specification thereunder are set aside and dismissed. The findings of guilty to Charge II, violation of Article 110, Uniform Code of Military Justice, and the specification thereunder are affirmed. The sentence has been reassessed and upon reassessment only so much of the sentence as provides for confinement for sixteen months is affirmed. That portion of the sentence not affirmed is set aside. All rights, privileges and property of which the accused has been deprived by virtue of that portion of the sentence set aside shall be restored.

BAUM, Chief Judge (concurring):

I concur fully with Judge Barry and write primarily to express my thoughts regarding the offense of willful hazarding of a vessel and the statutory maximum punishment for that transgression. As noted in Judge Barry's opinion, after trial defense counsel, in his capacity as detailed appellate counsel, submitted the case without any specific assignments of error or argument, other than urging the Court not to approve a bad conduct discharge, the Court ordered the appointment of another appellate defense counsel and the briefing of two issues. The first issue has been addressed by Judge Barry. The other issue which we ordered briefed was whether starting a fire in the paint locker of a moored vessel, as alleged in the specification under Charge II, by a person having the accused's duties and responsibilities, constitutes the offense of willfully and wrongfully hazarding a vessel under Article 110, Uniform Code of Military Justice.

After full consideration of the briefs submitted and a study of the legislative history of Article 110, we are convinced that the leading case which directly addressed this issue reached the proper conclusion. That case, *United States v. Adams*, 42 C.M.R. 911 (N.C.M.R.1970), delved into the legislative history of Article 110 and found the Articles for the Government of the Navy to be the source for the present Uniform Code of Military Justice offense. Two particular articles, one relating to hazarding through neglect and the other to intentional acts, were incorporated into Article 110, Uniform Code of Military Justice. Language in the Navy's intentional hazarding infraction that the *Adams* court found dispositive made it an offense if anyone:

> "maliciously or willfully injures any vessel of the Navy, or any part of her tackle, armament, or equipment, whereby the safety of the vessel is hazarded or the lives of the crew exposed to danger."

*Id.* at 915

The court in *Adams* saw this antecedent article as extending hazarding beyond navigational or operational acts to include any willful injury to a vessel from any source. As a result, the court rejected the defense argument that Article 110, Uniform Code of Military Justice encompasses only actions which affect the navigational or operating activities of a vessel. It also rejected the defense argument that Article 110 was limited to punishing only those persons specifically entrusted with navigational or operational responsibilities. Our review of the legislative history to Article 110, Uniform Code of Military Justice also convinces us that the conclusions reached in *Adams* were correct and for that reason, we too, must reject the arguments advanced by appellate defense counsel in this case.

With respect to the maximum punishment for this offense, however, I am hard pressed to understand the rationale behind Congress's elevating to a capital crime acts which would be nothing more than aggravated arson in another setting. It is not readily apparent why arson aboard a moored vessel should warrant the death penalty when the same, or even more serious acts of arson ashore, carry a maximum punishment which includes only 20 years confinement. Possibly, this sea service transgression, with its maximum punishment of death, was incorporated into the Uniform Code of Military Justice without the kind of scrutiny given crimes and punishments of more general application. For example, the following offenses, common to all the services, were punishable by death under the Articles for the Government of the Navy, whenever committed, but ended up with far lighter authorized

punishments under the Uniform Code of Military Justice when committed not during time of war: disobeying the lawful orders of a superior officer; assaulting a superior officer while in the execution of the duties of his office; sleeping on watch; leaving one's station before being regularly relieved; and unlawfully setting on fire, or otherwise unlawfully destroying public property. It would be an anachronism today, under non-wartime conditions, if any of these infractions were considered capital. In my view, it is just as anachronistic for the misdeed encountered here to carry a death penalty. Those charged with drafting amendments to the Uniform Code of Military Justice and executive orders that establish maximum punishments for Uniform Code of Military Justice offenses may wish to look anew at Article 110, Uniform Code of Military Justice to determine whether the kind of fact situation encountered in the instant case should continue to be treated as capital, or even for that matter, as a hazarding offense. For the wrongdoing we have here, consideration might be given to limiting the chargeable violation to arson under Article 126, Uniform Code of Military Justice.

I agree with Judge Barry that even though the instant offense was referred for trial as a non-capital case with a maximum punishment of life imprisonment, there was still the possibility of prejudicial impact from such a heavy and inappropriate maximum sentence. Under different circumstances, we might be prompted to return the case for further action, but, as indicated in the principal opinion, such a course is unnecessary, since the curative steps we have taken at this level have purged any possible prejudicial error. In arriving at our final action, we have been confronted with a number of factors bearing on the sentence, some weighing more heavily than others. I, for one, have been particularly affected by what I see as a sequence of events leading inescapably to the ultimate charge.

We have before us an acknowledged alcoholic, known to be such by his command, and one who has been symbolically crying for help for some time, without, as Judge Barry has outlined, the kind of command attention called for in Coast Guard regulations. Even more important, from my perspective, were the missteps after the accused returned from unauthorized absence. While the precise offense that resulted, may not have been predicted, it was reasonably forseeable that, if the accused started drinking again, adverse acts were likely to result. It seems to me that once the decision was made to take the accused along on patrol, rather than leave him ashore awaiting discharge, there was an obligation to keep this young man out of harm's way. In my view, sending him on liberty in Key West, Florida with the admonition not to drink was not in keeping with that obligation. Instead, it was simply asking for trouble. In fulfilling our statutory responsibility to approve only such sentence as we determine on the basis of the entire record should be approved, we must look at all matters in extenuation and mitigation, including the role command may have played in what ultimately happened.

Had there been follow-through on certain actions, which Seaman Roach and his father thought were promised, the likelihood of a court-martial offense occurring was, indeed, remote. The father claimed he was told that his son would not be taken on patrol. In reconsidering that purported commitment, the ship's captain said at trial that the accused was advised he would not be subject to the temptation of alcohol while at sea. Thereafter, it was the commanding officer's very act of suspending restriction that subjected the appellant to this temptation. In fact, during the guilty plea inquiry, the accused recounted the captain saying, "he was going to let me go on liberty in Key West to have the full temptations as everybody else aboard the ship." R. 41 and 42. If Seaman Roach had been left ashore for medical evaluation, as the father said he was assured, this particular crime would never have been committed. Moreover, upon the accused's being taken to sea instead, there still would have been little chance of the offense if the accused had been kept in a restricted status aboard ship as part of properly imposed non-judi-

cial punishment. In either event, the appellant would have been administratively discharged in accord with directions received from Coast Guard Headquarters on the very day the fire was set. At this point, I believe it entirely appropriate that Seaman Roach finally receive the kind of discharge authorized earlier instead of the one resulting from this court-martial. I fully concur with the sentence action taken upon reassessment.

BRIDGMAN, Judge, (concurring):

I agree with the results reached by Judge Barry that the order not to drink was illegal, however I reach this result without consideration of the fact that the accused was a diagnosed alcoholic; the existing Coast Guard policies concerning the disposition of members who are alcoholics; or the command's treatment of the accused in relation to his disease. In my view, the order given in this case simply did not have sufficient nexus to any military duty to be valid, despite the statements made by the accused during the providency inquiry and the admittedly speculative rationale of the dissent.

Although not patently illegal, courts have carefully scrutinized an order restricting an individual's privilege to consume alcoholic beverages. I start from the premise that an unrestricted order not to drink would be regarded as an improper infringement on this privilege, and have attempted to discern some means of identifying when a limitation on drinking is a valid order, or at least mark some of the boundaries of such an order. Limiting the duration of the order is, apparently, not of itself sufficient (*United States v. Wahl*, 4 C.M.R. 767 (A.B.R.1952)), nor is imposing the order to prevent repeated criminal activity while under the influence (*United States v. Wilson*, 12 U.S.C.M.A. 165, 30 C.M.R. 165 (1961). Even an order purporting to be limited to effects during duty hours may be so broad and standardless as to be unenforceable (*United States v. Green*, 22 M.J. 711 (A.C.M.R.1986)). Unfortunately, there is a dearth of reported cases discussing the circumstances under which an order not to drink is valid.

The discussion of lawfullness in Paragraphs 14c(2)(a) and 16c(1)(c), Manual for Courts–Martial, 1984 (MCM) is not particularly helpful. Although not specifically stating that the order is unlawful, the "Note" following paragraph 16e(2) MCM states that punishment under Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892 does not apply "if, in the absence of the order or regulation ... the accused would, on the same facts be subject to conviction for another specific offense." A perusal of the established offenses involving the abuse of alcohol is enlightening. These offenses include: Drunk on duty (Article 112, Uniform Code of Military Justice, 10 U.S.C. § 912); Drunk on board ship or in some other place (Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934, Paragraph 73, Manual for Courts–Martial); and Incapacitation for performance of duties through previous wrongful indulgence (Article 134, Uniform Code of Military Justice, Paragraph 76, Manual for Courts–Martial). None of these offenses are committed by the simple act of drinking. Drinking with a prisoner, while in charge of the prisoner, is an offense, regardless of the amount consumed (Article 134, Uniform Code of Military Justice, Paragraph 74, Manual for Courts–Martial) and *United States v. Wahl, supra,* recognized that drinking while on duty may be prohibited, but the remaining offenses relate to the consequences of drinking, not the simple act of drinking.

If lawful, the order in question here was violated at the first sip of any beverage containing alcohol, without regard to the impact on the physical condition of the accused, his subsequent conduct, or his ability to perform military duties. Arguably, if the accused purchased a beer with the intent to drink it, he could be charged under Article 80, Uniform Code of Military Justice, 10 U.S.C. § 880 in an attempt to violate the order. I am unwilling to attach legal significance to the determination that the accused was an alcoholic in order to distinguish this case from *United States v. Wilson, supra,* and therefore conclude that the admonition not to drink was not a law-

ful order that would support a conviction under Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892. The administrative consequences of consuming alcohol in violation of Article 20–C–7c(2), Coast Guard Personnel Manual, COMDTINST M1000.6, is not a matter within the purview of this Court.

As previously noted by Judge Baum, this Court directed that briefs be submitted on the issue of whether the accused's actions constituted the offense of hazarding a vessel, in violation of Article 110, Uniform Code of Military Justice. My concern was that, following a long history of this offense being related to the navigation of a vessel and persons responsible for the safe navigation of a vessel, recent cases appeared to have expanded the scope of this capital offense. The issue has been well briefed. I concur with Judge Baum's conclusion that the acts committed by the accused in this case constitute an offense under Article 110 but am compelled to urge the reexamination of this issue by those exercising legislative authority.

Article 110, Uniform Code of Military Justice is applicable to "Any person subject to this chapter...." While the term "hazards" requires further explication, there is no contention that the acts of the accused in this case did not put the vessel "in danger of loss or injury" (Paragraph 34c(1) Manual for Courts–Martial, 1984). Where the language of the statute conveys a clear and definite meaning, a court has no right to search for a different or limited meaning. *United States v. Graham*, 16 M.J. 460 (C.M.A.1983). In any event, the legislative history concerning Article 110 is so sparse that it sheds little light on the intent of the legislature and, as stated by Judge Baum, (page 14) this offense may not have received the attention given crimes considered to have more general application. It would be convenient to simply stop at this point, and give no further consideration to the question of whether Article 110 *should* apply to the full extent of its terms, however, I believe the consequences of so expanding a capital offense warrant further discussion.

It seems clear that Article 110, Uniform Code of Military Justice is an amalgam of former Articles for the Government of the Navy (A.G.N.) 4(10) and 8(11) and the proposed A.G.N. 8(6) and 9(21). *United States v. Adams*, 42 C.M.R. 911 (N.M.C.M.R.1970). Prior to *Adams*, there are three Coast Guard and two Navy reported cases concerning Article 110 involving *negligent* hazarding of a vessel by someone responsible for the vessel's navigation: *United States v. Day*, 23 C.M.R. 651 (N.B.R.) 1957; *United States v. Sievert*, 29 C.M.R. 657 (N.B.R.1959); *United States v. MacLane*, 32 C.M.R. 732 (C.G.B.R.1962); *United States v. Klein*, 35 C.M.R. 686 (C.G.C.M.S. 21722 1964); and *United States v. Kobler*, 37 C.M.R. 763 (C.G.B.R.1966). Since 1970, in addition to *Adams, supra*, there have been several Navy cases where an accused was found to have *willfully* hazarded a vessel by causing damage or injury to the vessel: *United States v. Drake*, 10 M.J. 505 (N.M.C.M.R.1980); *United States v. Tusing*, 12 M.J. 608 (N.M.C.M.R.1981), aff'd in part, rev'd in part on other grounds, 13 M.J. 98 (C.M.A.1982); *United States v. Buckroth*, 12 M.J. 697 (N.M.C.M. R.1981), aff'd in part, rev'd in part on other grounds, 13 M.J. 108 (C.M.A.1982); and *United States v. Julien*, 17 M.J. 427 (C.M. A.1984). These cases are in accord with the views expressed by the drafters of the Manual for Courts Martial, 1951, "Cases of hazarding a vessel, though involving actual damage or destruction, should be pleaded under Article 110 as the more serious offense rather than under Article 108." *Legal and Legislative Basis, Manual for Courts–Martial, United States, 1951*, pg 269, although arguably at variance with the apparent basis for that view, "The high standard of strict responsibility for the safety of a ship and her crew that is imposed upon naval officers...." *Id.*

The problem with a literal interpretation of Article 110, Uniform Code of Military Justice, is that it is virtually boundless. Although derived from the A.G.N. and the traditional standards imposed on naval officers, it now extends to all members of the armed forces, regardless of branch of service or rank. See *United States v. Strea-*

*tor,* SpCM 14969, (A.C.M.R. unpub., 12 September 1980).[3] Article 110 is not limited to damage to, or loss of, a warship, with living accomodations in proximity to flamables, chemicals, and explosives and the other concerns expressed by Judges Josephson and Burgess, (page 21). Article 110 expressly applies to "any vessel of the armed forces" and, since 1 U.S.C. § 3 defines "vessel" as a "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water," there is no limit as to size or purpose of the vessel. In view of *United States v. Simonds,* 20 M.J. 279 (C.M.A.1985), Article 110 apparently applies to hazarding a canoe owned by a military recreational facility supported by appropriated funds. A Navy court has stated, in dicta, that Article 110 could apply to "a military air- or spacecraft" (See *United States v. Buckroth, supra,* Fn. 1 at 701). Should the occasion arise, I would hope a court would carefully consider the design of the vehicle and its capability of providing *transportation* on water. Fortunately, seaplanes and amphibian aircraft are no longer prevalent in the armed forces, but while waterborne these aircraft are considered vessels, and a member of the armed forces who willfully damages such an aircraft could conceivably be charged with a capital offense under Article 110. By comparison, those wishing to prosecute the miscreant who willfully damages a RF–4, F–15, or similar aircraft must apparently settle for the ten years maximum confinement imposable for sabotage under 18 U.S.C. 2155. *United States v. Johnson,* 24 M.J. 101 (C.M.A.1987); *United States v. Ortiz,* 24 M.J. 164 (C.M.A.1987).

Another problem caused by the merger of A.G.N. 4(10) and 8(11) into Article 110,

Uniform Code of Military Justice concerns the apparent disappearance of the requirement under A.G.N. 8(11), which was the capital offense, that the intentional damage to a vessel or its equipment had to be such "whereby the safety of the vessel is hazarded or the lives of the crew exposed to danger." [A.G.N. 8(11).] Paragraph 34c(1), Manual for Courts–Martial, 1984 states "Actual damage to ... a vessel ... by any other cause, is *conclusive* evidence that the vessel was hazarded...." (emphasis added). The uncertainty in this area is best illustrated by *United States v. Tusing, supra,* where the court noted with approval the military judge's finding that "electrical shock is a hazard ... only to individuals, and that is not the charge." but apparently relied on the finding of "a danger of fire", rather than simply the actual damage, to uphold the conviction under Article 110. 12 M.J. at 609.

In my opinion, the greatest danger in an overbroad expansion of Article 110, Uniform Code of Military Justice is the potential for overbearing use of charges of willful hazarding by zealous prosecutors who are advising commands on the preferral of charges.[4] The incentive of the accused to plea bargain, when faced with a maximum punishment of death or life imprisonment, may lead to inappropriate pleas. Perhaps it was a factor in this case, where the defense rejected the military judge's invitation to challenge the legality of the order not to drink, as discussed fully in the opinion of Judge Barry, (pg. 864) and the separate opinion of Judges Josephson and Burgess (pg. 874). This particular aspect could be ameliorated in a manner similar to that utilized for offenses under Article 92,

3. Among other offenses, the accused, a Private (E–2) was convicted of a violation of Article 110 for briefly leaving the wheelhouse of an Army vessel while on watch as helmsman. The vessel was underway at sea on automatic pilot. On review, it was held that the accused's actions did not hazard the vessel.

4. See *United States v. Giusti,* 22 M.J. 733 (C.G.C. M.R.1986). The record of trial and associated documents indicate that seven specifications of willfully hazarding a vessel, under Article 110, Uniform Code of Military Justice, were initially referred to trial as capital offenses, along with

corresponding specifications under Article 92, Uniform Code of Military Justice alleging dereliction of duty and additional corresponding specifications alleging use of marijuana, also under Article 92. The charges arose out of smoking marijuana while coxwain of a 41 foot boat underway. The accused was acquitted of the hazarding offenses. The dereliction of duty and use of marijuana offenses were considered multiplicious for sentencing at trial and were subsequently held to be multiplicious for findings.

Uniform Code of Military Justice. Paragraph 16e, Manual for Courts–Martial, 1984 indicates that the maximum punishment set forth for Article 92 offenses does not apply where the facts support conviction for another specific offense carrying a lesser punishment. Reserving the maximum punishment of death or life imprisonment for those Article 110 offenses involving the navigation of the vessel, while still leaving the hot tempered boater who breaks a paddle or deep-sixes a recalcitrant outboard motor to act at his peril, would remove much of the incentive to reach for the broadest interpretation of Article 110, and foster the fundamental principle that criminal statutes be construed narrowly. In this regard, it is interesting to note that the drafters of Manual for Courts–Martial, 1984, although calling attention to *United States v. Adams, supra,* in the Analysis of Paragraph 34 (Manual for Courts–Martial, 1984, pg A21–93) did not revise the explanation of "hazard" or "suffer" in Paragraph 34c to include any examples not related to navigation of a vessel.

Under Article 66(c), Uniform Code of Military Justice, we may affirm only a sentence that we determine is appropriate "on the basis of the entire record." On that basis, I concur with the action taken on the findings, the reassessment of the sentence, and the action taken on the sentence upon reassessment.

JOSEPHSON and BURGESS, Judges (concurring in part and dissenting in part):

We concur with affirmance of the guilty finding for violation of Article 110, Uniform Code of Military Justice. We dissent from the disapproval of the guilty finding for violation of Article 90, Uniform Code of Military Justice, and the reassessment of the sentence.

This case well illustrates the type of problem which has led Judge Cox of the U.S. Court of Military Appeals to express reservations about making substantive law based on a guilty-plea record. See e.g. *United States v. Byrd,* 24 M.J. 286, 293 (C.M.A.1987) (Cox, Judge, concurring in the result). Without the benefit of a thorough trial of the issues, including the facts which elucidate legal questions and help to place them into focus, much of what an appellate court says is necessarily hypothetical and academic. Nevertheless, such speculation seems necessary to illustrate why we would not disturb the findings and sentence in this case.

Our brothers invite a re-examination, by appropriate authorities, of the maximum punishment for a violation of Article 110 (hazarding a vessel). By implying that the offense of willfully hazarding a vessel may be anachronistic, and by seemingly downplaying the seriousness of that offense, this Court may be doing a disservice to the men and women serving aboard our vessels, undergoing grueling operational schedules, and frequently finding themselves "in harms way". Setting a shipboard fire, even pierside, is not analogous to arson of a building ashore and ignores the many distinctions, only a few of which we mention below, between the two. Shoreside buildings with living accommodations do not ordinarily contain the flammables, chemicals and explosives found aboard a vessel which increase significantly the potential danger to the vessel, its crew, and surrounding vessels, people, facilities, and the environment. Shipboard fires are fought primarily by the ship's crew. Accessibility to and exit from compartments is restricted. Unventilated smoke can be a high hazard. At night, in-port, the number of personnel who can timely respond is usually limited. The loss of or damage to a building ashore due to a fire does not have the same impact on national defense, military preparedness and mission performance as would the loss of or damage to a U.S. warship due to fire. Should the maximum punishment for hazarding a vessel be re-examined, we suggest that such distinctions and the unique nature of U.S. warships call for a severe maximum sanction.

The majority have difficulty reconciling the maximum imposable sentence for the offense of hazarding a vessel with the results of Seaman Roach's efforts. That Seaman Roach subsequently had second thoughts and that a major conflagration

with significant personnel casualties was avoided is certainly fortunate. Yet it could easily have been otherwise. Numerous factors could have prevented early detection or successful extinguishment of the fire. One need not be particularly imaginative to identify such factors.

With respect to the "order" offense much attention, in our view misplaced, is focused on perceived command shortcomings. Recognizing that an order to refrain from drinking alcohol *may* be lawful, the proper focus, it seems to us, is on the military purpose of such an order, rather than parental conversations or the amount of recurrent treatment, rehabilitation and attention appellant may or may not have received. Except insofar as matters of leadership, management, or the priorities of command directly impact on military justice, e.g. unlawful command influence, we think it inappropriate to address such matters in this forum. Additionally, the limited focus on such collateral matters in records of trial precludes a full consideration and fair assessment of command performance in the abstract.

An order from a superior commissioned officer requiring the performance of a military duty or act may be inferred to be lawful. The inference of lawfulness does not apply to a patently illegal order. Para. 14c(2)(a)(i), Part IV, Manual for Courts–Martial, 1984. Three considerations concerning the lawfulness of an order may be deduced from this explanation in the Manual for Courts–Martial. First, a patently illegal order is obviously unlawful. Second, if the order requires the performance of a military duty or act it may be inferred to be lawful. Third, an order which does not require the performance of a military duty or act is not inferred to be lawful. Which is not to say that such an order necessarily is unlawful. However, to be lawful, an order at least "must *relate to* military duty." (Emphasis supplied). Para. 14c(2)(a)(iii), Part IV, Manual for Courts–Martial, 1984.

An order to refrain from consuming alcoholic beverages is not patently illegal. The example of a patently illegal order given in the Manual for Courts–Martial is an order that directs the commission of a crime. Clearly, the order in question does not direct the commission of a crime. Prior opinions of military courts and boards dealing with orders to abstain from drinking alcohol establish that such orders are not patently illegal. See Judge Barry's opinion.

Appellant also relies on *United States v. Green,* 22 M.J. 711 (A.C.M.R.1986) for the proposition that, regardless of the purpose for the order, an order not to drink alcohol is unlawful. In *Green, supra,* a regulation prohibiting soldiers from having any alcohol in their systems, or on their breath, during duty hours was found to be invalid and unenforceable because it was arbitrary, unreasonable and standardless. Clearly, the broad reach of the regulation in *Green, supra* is distinguishable from the order in the instant case, which was time and location specific. *Green* does not stand for the broad proposition appellant asserts.

The Manual for Courts–Martial provides:

> "*Relationship to military duty.* The order must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service. The order may not, without such a valid military purpose, interfere with private rights or personal affairs."

Paragraph 14c(2)(a)(iii), Part IV, Manual for Courts–Martial, 1984.

Undoubtedly, an order "not to consume alcohol" interferes with private rights or personal affairs. Nevertheless, it may still be lawful if it serves a valid military purpose, such as one or more of those stated in the first sentence of the above-quoted provision of the Manual for Courts–Martial.

Appellant could have been restricted during the Key West in-port as a result of his underway non-judicial punishment. Instead, his Commanding Officer suspended the restriction awarded and chose the less severe route of permitting liberty subject to the abstention order. Appellant chose

not to contest the lawfulness of the order and pled guilty to the charge. At this point attention turns to the "providence" inquiry. While it may be a close call, we would find the inquiry adequate in this regard.

In this "guilty plea" case the record of trial is, obviously, less comprehensive respecting the military concerns and factual background surrounding the issuance of the order than would be expected had the issue been contested and fleshed-out at the trial level.

The military judge questioned appellant concerning what justification the latter saw in the order. Appellant's responses, set out in Judge Barry's opinion, indicate appellant's recognition that compliance with the order would lessen the likelihood of a recurrence of his earlier problem with civil authorities in Key West. Appellant also recognized that issuance of that order was not merely a matter of solicitude for his personal well-being. While articulating the supposition that the command may have been concerned about the vessel's reputation in Key West, appellant acknowledged that the purpose of the order "... could be a case for the Coast Guard." We think it is readily apparent that this order was a "case for the Coast Guard" and related to military duty. We believe that this was also clear to the military judge. In addition to the responses set out in Judge Barry's opinion appellant stated, "He also did it for the safety of the ship. I'm a ... qualified watch-stander, I'm a helmsman, a look-out, a qualified messenger...." (R. 49). This recitation of some of his shipboard responsibilities points to the nexus between this limited order and an underlying military purpose. Were this individual to have one drink, he would probably have more. Appellant's previous experience in Key West provided the foundation for a valid expectation that if he drank he was likely to engage in conduct adversely affecting the ship, its mission, its crew, or his ability to perform his duties aboard the ship. Nor can we say that the commanding officer should have anticipated that appellant would drink, despite the order. Appellant, himself, stated he could have abstained from drinking and had done so before (R. 46). With appellant's acknowledgment that the order was not merely for his own benefit, strengthened by defense counsel's representation to the military judge on two occasions (R. 23, 49) that lawfulness of the order was not an issue, we see no need for the military judge to have pursued the obvious by further questioning of appellant in this regard.

It also seems apparent to us that the government, if put to the test, would have easily established a valid military purpose underlying this order, to this individual, in the circumstances of this case. To mention just a few possibilities we refer to appellant's previous problem in Key West, the nature of the CGC DEPENDABLE'S patrol, the brevity and nature of the overnight in-port in Key West, the importance of avoiding disruption to resumption of the patrol, the nature of appellant's duties aboard the vessel—both normal duties and emergency response duties in accordance with his Watch, Quarter and Station Bill assignments, the consequences of his absence from the vessel, and the impact on others who would have to undertake additional duties in his absence. Such factors and others might have been fully developed, *in toto* or in various combinations, to establish a "valid military purpose" if the charge had been contested.

The mere "possibility" of a defense does not require rejection of a guilty plea. "In many criminal cases, the tactical possibility of raising a defense exists even though the accused and his counsel know that the contention has little substance ..." *United States v. Logan*, 22 U.S.C.M.A. 349, 351, 47 C.M.R. 1, 3 (1973). Appellant did not raise matters in "substantial conflict" with his plea. Rejecting that plea would be a "hollow gesture", *Id.*, in the circumstances of this case. We believe the issue of the possible defense of unlawfulness of the order was adequately resolved. Additionally, it would ignore reality not to recognize that the military judge, by virtue of his general familiarity with the nature of Coast Guard operations, was aware of the military and operational environment applicable to the CGC DEPENDABLE and its

crew during this brief in-port period. Along with defense counsel's representations, appellant's acknowledgements, and the absence of information raising a substantial conflict with appellant's plea, this general awareness contributes to the reasonableness of the acceptance of the guilty plea.

We would affirm the findings and sentence, as approved below. Even absent the "order" offense, we would affirm the sentence due to the gravity of appellant's conduct in hazarding the vessel.