**UNITED STATES**

**v.**

**James D. CARROLL, Seaman, U.S. Coast Guard.**

**CGCM 0022. Docket No. 926.**

U.S. Coast Guard Court of Military Review.

21 March 1990.

Trial Counsel: LCDR Lawrence Eppler, USCG.

Assistant Trial Counsel: LT David Sump, Washington, D.C., USCG.

Detailed Defense Counsel: LT Nicholas E. Grasselli, USCG.

Assistant Defense Counsel: LT Kevin Collins, USCGR.

Appellate Government Counsel: CDR Richard T. Buckingham, USCG.

Appellate Defense Counsel: LCDR James Collin, USCG.

Before Panel One, BAUM, BRIDGMAN, JOSEPHSON and SHKOR, Appellate Military Judges.

BRIDGMAN, Judge:

Appellant was tried by General Court-Martial, judge alone. Pursuant to guilty pleas entered in accordance with a pretrial agreement, appellant was convicted of one specification of indecent assault, one specification of attempted indecent assault and one specification of communicating a threat in violation of Articles 80 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 934. Thereafter, the military judge sentenced appellant to a Bad Conduct Discharge, confinement for eight months and reduction to pay grade E–1. That sentence fell within the terms of the pretrial agreement and was approved by the convening authority as adjudged. Before this Court, appellant has assigned two errors: that his pleas of guilty to indecent assault and attempted indecent assault were improvident; and that the staff judge advocate's failure to respond to defense counsel's post-trial submission deprived the convening authority of an informed decision on appellant's sentence. After review of the record and full consideration of the well presented

written and oral arguments, we have reached conclusions contrary to those advanced by appellant.

■ Appellant fully acknowledged his guilt to each offense and recited facts which support the offenses in every respect. Moreover, we discern no unresolved potential defenses that were raised by any of the appellant's answers, his unsworn statement, or any other evidence of record. In short, we have determined that the findings of guilty are in full accord with the pleas and the thorough inquiry by the judge and were properly found by the judge to be provident. For this reason, appellant's first assignment is rejected.[1]

■ With respect to the second assignment of error, we do not believe the Uniform Code of Military Justice or the Manual for Courts–Martial require the staff judge advocate to respond to a defense counsel's post-trial clemency request. Accordingly, we find no error in the staff judge advocate's failure to respond. Furthermore, in our view, the convening authority was not deprived of any advice needed to make an informed decision on appellant's sentence. The clemency request from the defense counsel was available to the convening authority along with the record of trial and the staff judge advocate's recommendation. No further guidance was needed by the convening authority to make an informed decision on the sentence. Accordingly, the second assignment of error is also rejected.

Left for decision is whether we consider the approved sentence appropriate for these offenses and the accused. The facts of this case fall within the category of offenses that have been characterized as "date rape". In fact, the accused was charged with rape, assault with intent to commit rape, and attempted rape. In essence, the accused, victim Seaman Apprentice H, and another male shipmate EM3 K, went on liberty together. After all three had consumed various quantities of alcoholic beverages, Seaman Apprentice H, feeling the effects of the drinks she had consumed, wanted to return to the ship. The ensuing events can best be described by a redacted extract from the stipulation of facts entered into by the accused.

> Seaman Carroll did not return directly to the ship. Instead he stopped the car alongside the road in Virginia Beach. Seaman Apprentice H ... and EM3 K ... were asleep or unconscious. Seaman Carroll then began kissing and fondling Seaman Apprentice H.... He also removed her trousers. Seaman Apprentice H ... appeared to be slipping in and out of consciousness during Seaman Carroll's physical advances. At some point Seaman Carroll decided to have sexual intercourse with her. He removed a tampon from her vagina and threw it out the window of the car. He then had sexual intercourse with her. EM3 K ... remained asleep or unconscious in the back seat of the car all the while.

Record of Trial at 25.

Following this activity, the accused woke up EM3 K and invited him to have sexual relations with the victim. Although EM3 K accepted the accused's invitation and proceeded to kiss and fondle Seaman Apprentice H, he ceased his activities when

---

1. We are concerned that an accused may perceive the potential benefit to be gained through a plea bargain to be so great that the truth is obscured, even to the point of committing perjury to "save the plea". We find no evidence of this in the record of trial and are further assuaged in this regard by the Article 32 investigation. The report of this investigation indicates that the accused initially denied that any sexual activity took place, then admitted to consensual intercourse with a conscious and participating Seaman Apprentice H, and finally, after a consensual polygraph examination, admitted that Seaman Apprentice H was unconscious during the act of intercourse. Since the accused did not reduce this admission to writing and the civilian detective investigating the incident did not testify at trial, we have only the detective's summary of the accused's statement. Although differing somewhat concerning the degree of Seaman Apprentice H's wakefulness during the accused's initial sexual overtures, we find nothing in this summary to impugn the statements made by the accused during the inquiry into the providence of the plea. We note that the admission was made within 48 hours of the offense, prior to the decision to prefer charges, prior to the selection of a forum to dispose of the charges, and prior to negotiating the terms of the plea bargain.

Seaman Apprentice H objected upon awakening or regaining consciousness.

During the inquiry into the providence of the plea the government indicated that it would not proceed on the original charges if the pleas to the lesser included charges were accepted. The military judge, recognizing the critical nature of the victim's consent, or lack thereof, to both the charged offenses and the lesser included offenses, conducted a careful inquiry into this area. During the initial inquiry, and again when the military judge sought clarification following the accused's unsworn statement, the accused admitted that Seaman Apprentice H was either asleep or unconscious when the acts constituting indecent assault occurred and when he falsely indicated to EM3 K that Seaman Apprentice H "wanted to see him".

■ The subject of "date rape" has received considerable attention, with various surveys decrying its prevalence in our society as a whole and in particular subsets of that society. It is clear that there exists a wide divergence of attitude as to the seriousness of this conduct, at least in the absence of excessive force or violence. As noted by Chief Judge Baum, it appears that the accused's commanding officer and others in the command would have disposed of the case at a level lower than a General Court–Martial. In addition to the admirable goal of establishing the accused's good performance, the testimony elicited by the defense from members of the command can be categorized as "Seaman H is a troublemaker and poor performer", and "sailors (including females) will be sailors". In addition, while the record reflects the commendable efforts of both counsel and military judge to comply with MRE 412, which restricts evidence of the victim's past sexual behavior, it is clear that this was a factor affecting the attitude of some of these witnesses.[2] While recognizing the continued existence of these views, we reject them as a legitimate basis for assessing the seriousness of sexual assaults. Certainly

the Convening Authority was free to reject them and refer the charges to a General Court–Martial.

This court has recently had other occasions to consider the appropriateness of a sentence which terminated the career of a person who, prior to conviction, had an exemplary record. We approved a Bad Conduct Discharge for a petty officer with "a spotless Coast Guard record", who had "performed in an outstanding manner", and who was "still considered worthy of retention" by her superior, a Lieutenant Commander, *U.S. v. Santos*, 29 M.J. 1064, (C.G.C.M.R.1990). We approved a sentence of dismissal for a Lieutenant Commander who had an "exemplary military record" spanning 18 years, including numerous medals and awards, acts of personal heroism, and the strong endorsement of his last commander, a Vice Admiral, stating "[W]e must balance this record against the very nature of the acts which constitute the offenses in this case." *U.S. v. Hardin*, 29 M.J. 801, 802 (C.G.C.M.R.1989).

■ We are mindful of the fact that the accused stands convicted only of offenses involving indecent assault, not rape, however these offenses were committed on a defenseless shipmate. Without disagreeing with Chief Judge Baum's observation that "in most cases the accused's immediate superiors are likely to be the best judges [of appropriate action to be taken.]", this is not one of those cases. The sentence adjudged was less than the limitations proposed by the accused. Despite the accused's excellent record, the favorable mitigation testimony, and the circumstances leading up to the offenses which accused believed to be extenuating, we can not say the sentence is disproportionate to the offense or for this accused.

Accordingly, the findings of guilty and sentence as approved below are affirmed.

Judge JOSEPHSON concurs.

---

**2.** In addition to objections to testimony and discussions of anticipated testimony at Article 39(a) sessions, Seaman Apprentice H's reputation was alluded to in the accused's unsworn statement during the sentencing phase of the trial. We are confident that the military judge was able to disregard the references made to such behavior.

BAUM, Chief Judge (concurring in part and dissenting in part).

I concur with the majority's rejection of the assigned errors and join in affirming the findings of guilty. I part company with respect to the sentence, however.

The offenses on their face may appear to be serious enough to warrant the approved sentence but when balanced against the highly favorable evidence in extenuation and mitigation, I see the resultant punishment as excessive, particularly the bad conduct discharge.

Significantly, the evidence reveals that appellant is a highly regarded Coast Guardsman, a hard worker with an excellent reputation aboard his ship,—not the kind of person deserving a bad conduct discharge—unless the very nature of the offenses demand punitive separation. Witnesses from appellant's command did not view the offenses in that light. They saw the incident as less serious than might otherwise appear—not justifying the level of interest and treatment received.

These witnesses believed the incident warranted no more than non-judicial punishment for all participants, based, in part, on their evaluation of the complainant and her initial reaction to what had transpired. Some saw the event escalating to a general court-martial due to her actions once she realized it provided an effective means for her transfer from a ship where she was not happy or well thought of by her superiors. It was conceded by the Government during oral argument that if the commanding officer's wishes had prevailed the appellant would not have been before a general court-martial. That outlook was also reflected in the testimony of the ship's executive officer, the appellant's department head, and the ship's radioman chief, Joseph Cipollo.

Both the accused and Chief Cipollo were ship plankowners, having served together in the pre-commissioning detail. Chief Cipollo had been senior enlisted man of that pre-com unit and for a long time on board USCGC TAHOMA he was the Chief Master-at-Arms. He also filled in periodically as the ship's Boatswain's Mate Chief. In these various capacities, all junior enlisted personnel had worked for him at one time or another. As a result, he knew those involved in the instant offenses very well. Furthermore, he was the person to whom the offenses were initially reported, since he was the Officer of the Deck the night they were committed. He, therefore, had a first hand knowledge of pertinent facts as well as personnel. He had the following to say with respect to the complainant, the offenses and the case disposition:

Q. During that period of time have you worked with Seaman Carroll?

.   .   .   .   .

Q. And H [the alleged victim]?
A. Yes, I've had contact with Seaman H also.
Q. In what capacity, Chief?
A. Seaman H arrived after we'd already gotten the ship. She wasn't there from the days of the pre-com. She arrived at some point during the yard period, I believe, in Baltimore. I had her as a mess cook. When I was the Chief Master-at-Arms ... all of the mess cooks work[ed] directly for me and I had Seaman H work[ing] for me in that capacity.

.   .   .   .   .

Q. Do you have—Have you formed an opinion concerning H's reputation for truthfulness?
A. Yes, I have.
Q. Could you tell us what it is please?
A. I think she's a liar.
Q. Is that based on her reputation on the ship?
A. It's based on her reputation on the ship and my dealings with her. I don't think she's ever been truthful to me. She's not outright lied but she's skirted the truth.
Q. Okay. Is she—In your dealings with H, is she an assertive person?
A. [Sarcastically.] Seaman H will use anything in her bag of tricks to do whatever she can to get whatever she wants. [Brackets in original Record of Trial.]

.   .   .   .   .

A. People do not believe it [the offense], including the women on the ship. So we're saying that the system has failed. That one 18 year old seaman has played havoc and hell with the system and gotten away with it.

Record of Trial at 111, 112 and 118.

Chief Cipollo expanded on this last conclusion in a colloquy with the trial judge in which he expressed the belief that pleas of guilty were driven by the accused's fear of the consequences of trial at the general court-martial level and that such pleas did not necessarily reflect the true events:

Q. Chief, ... Seaman Carroll ... pled guilty to indecent assault. He pled guilty to communicating a threat. He pled guilty to an attempted indecent assault by Petty Officer K on Seaman Apprentice H. Do you understand that?

A. Can I—Before I answer that question, was that a plea bargain plea? Did he plead guilty because of a plea bargain?

Q. There is a plea bargain involved in this particular case, Chief, but it's my responsibility to make sure that somebody doesn't plead guilty if they're—if they are not, in fact, guilty of what they pled to. Not that I'm infallible and not that another court might review what has transpired over the last couple of days here and disagree, but basically my responsibility is to ensure that Carroll isn't—didn't plead guilty to something he wasn't guilty of.

A. Captain, with all due respect to your judgment, I think if someone plea bargains—if we held up a carrot [motioning] and this is the lesser of the evils, it's there, and this is the unknown if you don't plea bargain. I think he was a frightened young man and ran for the carrot and said, this is a known if I plea bargain for this.

.    .    .    .    .

Q. I appreciate your testimony and I give it great weight, you having been his supervisor, as to his performance. But he pled guilty to an indecent assault on a fellow Coast Guardsman—woman in the Coast Guard so—I take it, is it your view

that he should suffer no punishment at all?

A. My personal view is that all three of them should be punished. My personal view is they were all three drunk out there raising hell. I don't think at this point, to be honest with you, and I'm not being—trying to be disrespectful to your court Captain, that anybody will ever get the total one-hundred per cent truth. My experience dealing with drunks, having been intoxicated myself, is that things slip then, you know, it gets so confusing I don't know who can sort it out at this point. If there was one sober person there, maybe we'd have all the facts and I think at this point also it's easy for me to say, well, you know, he should do this, he should do that but if I was in his shoes I wonder if I would not say—just to end it all and to know that it won't be as severe—I think I would have plea bargained to[o], to be completely honest with you. I don't think justice is being served that way while the truth is being guarded.

Record of Trial at 119–120.

I, too, have concerns about the truth, making it essential for me that the pleas of guilty are fully supported by the record. Here, the judge's correct and penetrating inquiry accomplished that result, accounting for my rejection of appellant's assigned error of improvident pleas. I am still left with a nagging concern, however, as to the effect on the accused and the judge of charges carrying a heavy maximum sentence at a general court-martial. In this case, as in *U.S. v. Roach*, 26 M.J. 859, (C.G.C.M.R.1988), the accused was initially faced with charges that authorized life in prison. Judge Barry speaking for the majority in *Roach, supra*, addressed the effect of such a potential sentence:

[W]e are troubled with the result which is reached in a case such as this. Even when such a case is referred as non-capital, the accused is forced to defend against an offense carrying the maximum punishment short of death—life imprisonment. This fact will influence both the accused and his counsel in any ef-

forts to achieve a pre-trial agreement. The maximum sentence will also influence the finder of fact in reaching a sentence to award. In both aspects, the high maximum sentence works to the detriment of the accused. As Chief Judge Everett recently noted in a general court-martial where there was a pre-trial agreement for a sentence which could have been awarded by a special court-martial:

> In the first place, the very fact that a case has been referred to a general court-martial tends to elevate the sentence that will be imposed in the event of conviction, because logically the sentencing authority will consider the maximum punishment in deciding what sentence to adjudge. If the charges against Murray had been referred to a special court-martial, which could have imposed no more than a bad-conduct discharge, 6 months' confinement, partial forfeitures, and reduction to pay grade E–1, the sentence adjudged might have been much less than was rendered by the general court-martial—where the maximum punishment authorized was a dishonorable discharge, 5 years' confinement, total forfeitures, reduction to E–1, and a fine. In short, sentencing authorities—whether, as here, a military judge or, as in other cases, members—tend to take into account the maximum sentence imposable in deciding what sentence actually should be adjudged.

*United States v. Murray,* 25 M.J. 445, 455, 456 (C.M.A.1988) (Everett, C.J., concurring in part and dissenting in part) (Footnote omitted).

*U.S. v. Roach, supra,* at 866.

Finally, the following evaluations of the accused by his department head, the executive officer and Chief Cippllo weigh heavily with me:

> He's a very good performer, sir. Leading seaman. I could easily give him a job and let him take care of it from—

from start to finish. I didn't have to worry about assigning anyone to supervise him. As a matter of fact, I could assign people to work with him ... as the leading seaman and the job—job results have always been good and he's always taken good pride—a lot of pride in the work that he's accomplished.

Testimony of the First Lieutenant, LTJG Rall. Record of Trial at 127.

> *Seaman Carroll's always been a good and hard worker, probably one of the best we had in our entire deck force, if not on the whole ship.* [Emphasis added.]

Testimony of the Executive Officer, LCDR Collier. Record of Trial at 136.

> *"He's the epitome of what anybody'd want for a seaman or a BM3; outstanding in all respects."* [Emphasis added.]

Testimony of Chief Cipollo. Record of Trial at 112.

It is my view that in most cases the accused's immediate superiors are likely to be the best judges of what is appropriate for a particular accused, the command and the Coast Guard in general, given their knowledge of that accused and the offenses committed. We have also come to expect the Government to put great stock in the observations of an accused's superiors within the immediate command. Here, the opposite seems to be the case, with the Government minimizing the command's views. Instead, the Government seems to be urging that the offenses alone cry out for a certain sentence and that the command's contrary outlook, as reflected by the testimony from Chief Cipollo, LTJG Rall and LCDR Collier, are to be discounted as missing the big picture effect of the offenses on the Coast Guard in general. I am not persuaded by that argument.

I place great credence in the reactions of the witnesses from appellant's command. While I am convinced that the findings of guilty must stand as provident, I am also convinced that the people who were closest to the parties and the events did not believe

a punitive discharge was warranted for this accused and these offenses. I agree with that assessment. I would set aside the bad conduct discharge and affirm the remainder of the sentence.

Judge SHKOR did not participate in this case.