UNITED STATES

v.

**Sergeant Rickie L. HILL, FR425–15–1487, United States Air Force.**

**ACM 31798.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 18 May 1995.

Decided 20 Feb. 1997.

Appellate Counsel for Appellant: Major Carol L. Hubbard (argued), Colonel Jay L. Cohen, Colonel David W. Madsen, Major Ormond R. Fodrea, and Captain Todi S. Carnes.

Appellate Counsel for the United States: Major LeEllen Coacher (argued), Colonel Jeffery T. Infelise, and Colonel Theodore J. Fink.

Before DIXON, HEIMBURG, PEARSON, SCHREIER, GAMBOA, MORGAN, C.H., II, STARR, SENANDER, and MORGAN, J.H., Appellate Military Judges, En Banc.

## OPINION OF THE COURT

STARR, Judge:

On the night of January 28, 1995, Staff Sergeant (SSgt) Sheila Spellman called the security police from her base quarters, claiming the new light on her back patio had just gone out. A security policeman responded, and in the darkness found the appellant at Spellman's back patio door. The appellant and Spellman were not strangers; they knew each other well, and this was the culmination of their turbulent five-year romance. The event also resulted in the appellant's conviction by general court-martial. After a fully litigated trial, officer members acquitted the appellant of multiple alleged assaults and threats against Spellman, but they convicted him of willful disobedience of an order not to contact Spellman and of attempted burglary of Spellman's house. The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for six months, and reduction to the grade of E–1.

The appellant presents five assignments of error. These are that: (1) the no contact order was unlawful; (2) the evidence is factually insufficient to support his attempted burglary conviction; (3) the base staff judge advocate (SJA) unlawfully prohibited him from visiting the alleged crime scene with his attorneys; (4) the military judge erred in his reasonable doubt instruction; and (5) the convening authority's SJA erred in the Addendum to the Staff Judge Advocate's Recommendation (SJAR). Only the first three warrant extended discussion. The appellant also presents a petition for a new trial based on newly discovered evidence. We reject all of the appellant's contentions, deny the petition for a new trial, and affirm the approved findings and sentence.

## THE NO CONTACT ORDER

The five year relationship between the appellant and Spellman had been marked by tension for at least three years. The appellant's fathering two children by his wife during the course of the relationship displeased Spellman. The appellant also had grievances, which centered on his perceptions of Spellman's past. The couple handled their disagreements privately until October 1994, when a security police gate guard saw them arguing. Security police took the appellant and Spellman to the law enforcement desk, where they provided differing accounts of

what had happened. According to Spellman, the appellant had come to her home, had accused her of "seeing someone else," and had pushed her and twisted her arm. Spellman said that she had taken her three-year-old son and had driven off base, and that the appellant had followed her and tried to run her off the road. She said she drove to the base gate for help. The appellant denied Spellman's accusations. According to him, they had argued and he had merely tried to stop her and calm her.

Other than Spellman's comment about being accused of "seeing someone else," neither of them disclosed the nature of their relationship. Neither of them disclosed that the appellant was the father of Spellman's three-year-old son. Relying on the information contained in the security police report on the incident, the appellant's squadron commander issued the appellant a letter of reprimand for assaulting Spellman. Meanwhile, the couple patched things up and continued their arrangement for another three months, when the security police received another complaint from Spellman about the appellant's treatment of her.

This time, the couple argued on the evening of January 22, 1995, and again on the morning of January 23. Later that morning, Spellman told her first sergeant the appellant had struck her, and the first sergeant called the security police. Spellman provided security police investigators a sworn written statement in which she accused the appellant of assaulting and threatening her for about two years, most recently earlier that morning.

Later that day, SSgt Lindley, a security police investigator, contacted the appellant's supervisor, Second Lieutenant (2Lt) Raines, and asked that the appellant be brought to the security police office for an interview. From the record it is unclear why he thought so, but when he interviewed the appellant, SSgt Lindley believed the appellant's first sergeant had ordered him to stay away from Spellman after the October incident described above. He therefore told the appellant he was suspected of both assault and disobedience of a lawful order. The appellant again denied ever assaulting or threaten-

ing Spellman; but this time he admitted that he and Spellman had engaged in a five year sexual relationship, omitting that he was the father of her son. According to the appellant, he wanted out of it, but Spellman would not leave him alone. The appellant said he just wanted to finish his enlistment without any more trouble.

At the end of the interview, with 2Lt Raines present, SSgt Lindley orally ordered the appellant not to contact Spellman at her home or duty section or be within 100 feet of her. 2Lt Raines then told SSgt Lindley that he (Raines) would issue the order to the appellant to stay away from Spellman. The next day, SSgt Lindley's participation in this aspect of the investigation ended when the Air Force Office of Special Investigations took over the case.

The appellant was found in the dark at Spellman's back door five nights later. He was charged with willful disobedience of an order not to contact Spellman, but not one issued by his first sergeant or 2Lt Raines. Because SSgt Lindley was mistaken in his belief that the appellant's first sergeant had issued such an order, and 2Lt Raines did not follow through with his announced intention, the government alleged willful disobedience of SSgt Lindley's no contact order, as a violation of Article 91, Uniform Code of Military Justice (UCMJ) (willful disobedience of a noncommissioned officer's (NCO's) lawful order).

The defense moved to dismiss this charge at the initial Article 39(a), UCMJ, session, arguing the order was unlawful. Two things about this motion pertinent to our resolution of the issue should be noted at the outset. First, the defense limited its attack on the order to SSgt Lindley's status *vis-a-vis* the appellant, asserting that the order was unlawful because he was not in the appellant's chain of command. The defense counsel, both in his brief and in his argument, made it crystal clear he was not challenging the terms of the order; he was only challenging who gave it. The defense counsel told the military judge: "If the chain of command had issued that order, I wouldn't be standing up here. It would be a legal order." Second, there was no factual dispute regarding the

issue. Both sides saw the matter as purely a legal issue. The military judge heard SSgt Lindley's testimony concerning his interview with the appellant and denied the motion.

In his testimony on the motion to dismiss, SSgt Lindley provided no specific reason for giving the order. Although the prosecution suggested it was because the security police investigation was ongoing, the only other witness—Spellman—had already been interviewed, and the military judge made no finding as to SSgt Lindley's purpose. We find the order was not intended to preserve the integrity of the investigation. SSgt Lindley's testimony persuades us it was to keep peace in the community until the appellant's scheduled discharge several months down the road. Article 66(c), UCMJ; *United States v. Givens*, 30 M.J. 294, 299 (C.M.A.1990). Given the growing notoriety of the tempestuous relationship, SSgt Lindley's motivation was praiseworthy; and ample support exists for the general validity of such orders when issued by the command. *United States v. Nieves*, 44 M.J. 96 (1996); *United States v. Flynn*, 34 M.J. 1183 (A.F.C.M.R.1992); *United States v. Hawkins*, 30 M.J. 682 (A.F.C.M.R.1990); *United States v. Wine*, 28 M.J. 688 (A.F.C.M.R.1989).

■ But does the command's failure to act to curtail the appellant's mischief invalidate the order of a perceptive and conscientious NCO outside the appellant's chain of command? We think not. SSgt Lindley was not acting as some interloping rogue here. He occupied a position of responsibility for law enforcement, knew the history between the appellant and Spellman (as much as they had disclosed so far), and realized the threat to the peace of the military community posed by their continued association. The proof of SSgt Lindley's prescience is in the pudding. Only five nights after assuring SSgt Lindley he wanted nothing more to do with Spellman, the appellant was apprehended prowling in her back yard with a knife and an air pistol, bringing the security police into the relationship yet a third time in only three months.

■ There is nothing in the history, the language, or judicial interpretations of Article 91 that condition the validity of an NCO's order on his or her command relationship to

the order's recipient. Willful disobedience of an NCO's lawful order as a specific military offense originated with the March 1, 1917, Articles of War (AW) and became AW 65. MANUAL FOR COURTS-MARTIAL, UNITED STATES (MCM) 1917, Appendix I, page 308. The offense was intended to have: "the same general objects with respect to noncommissioned officers as the sixty-third and sixty-fourth articles [had] with respect to commissioned officers, namely, to insure obedience to their lawful orders...." MCM (1917), paragraph 416. This same explanatory language appears in the current Manual. MCM, Part IV, paragraph 15c(1) (1995 Edition). The essential elements of the offense are that the accused was an enlisted person, warrant officer, or petty officer; that the accused received a lawful order from a noncommissioned, warrant, or petty officer; that the accused knew that the person giving the order was a noncommissioned, warrant, or petty officer; that the accused had a duty to obey the order; and that the accused willfully disobeyed the order. There is simply no requirement in Article 91 that the NCO giving the order bear any particular relationship to the order's recipient, and no such relationship has ever been judicially grafted onto this offense. *See United States v. McLaughlin*, 14 M.J. 908 (N.M.C.M.R.1982), *pet. denied*, 15 M.J. 405 (C.M.A.1983); *United States v. Pinkston*, 49 C.M.R. 359, 1974 WL 14079 (N.C.M.R.1974).

Before this Court, the appellant goes beyond his trial theory concerning the order's lawfulness, now claiming that the order, even had it been given by his chain of command, was unlawful because it was unduly restrictive of his personal rights. But because the appellant's counsel specifically eschewed such a theory at trial, the record was not developed with this issue in mind.

■ As a procedural matter, orders are inferred to be lawful, (MCM) Part IV, paragraph 14c(2)(a)(i) (1995 Edition), and the defense bears the burden of going forward with evidence to the contrary. *United States v. Stewart*, 33 M.J. 519, 520 (A.F.C.M.R.1991). Here the defense chose not to do so regarding the terms of the order, specifically limit-

ing the issue to the source of the order. Had the defense asserted at trial that the order was unlawful no matter who gave it, a record would have been made that would permit intelligent appellate review of that issue. It is likely the parties would have addressed the reason for the order, given the rule that orders abridging personal rights and private affairs must have a valid military purpose. *See* MCM paragraph 14c(2)(a)(iii) (1995 Edition). As we have said before, midstream horse changing upon reaching the appellate level invariably results in a less than optimal record on which to base appellate litigation. The deliberate decision by the defense at trial not to tackle the issue of the order's terms independent of its source precludes consideration of that issue on appeal. *See United States v. Folk,* 37 M.J. 851, (A.F.C.M.R.), *pet. denied,* 39 M.J. 75 (C.M.A. 1993); R.C.M. 905(e).

The dissent maintains the conviction must be set aside because the military judge erroneously took the element of lawfulness away from the members. Not even the appellant raises this as an issue, and the reason is clear. Given the defense theory of the case at trial, the *only* issue for the members was whether the appellant understood the order's terms, and the appellant sought and received the *pertinent jury instruction* on that issue. There simply was no factual dispute for the members regarding the order's lawfulness, because the defense picked the ground for battle elsewhere—the order's source. That was clearly not an issue for the members. Once the judge determined the source of the order passed legal muster, there was nothing for the members to decide concerning lawfulness, and the judge correctly instructed them based on the defense theory of the case. *Unger v. Ziemniak,* 27 M.J. 349, 358–59 (C.M.A.1989). The judge in no way forced this upon the defense. In an Article 39(a) session held to discuss proposed findings instructions, the judge notified the parties that he intended to instruct that the order, if given, was lawful, and he asked if the defense concurred. The answer: "Absolutely." Again at the end of the findings instructions the military asked if the defense had any objection to the instructions as given. The defense counsel again said he had

no objection. The defense clearly had no desire to litigate the order's lawfulness as a factual issue at trial, and the judge did not err in his instructions.

## SUFFICIENCY OF THE ATTEMPTED BURGLARY CONVICTION

The appellant was charged with burglary of Spellman's house by breaking and entering with the intent to commit assault. The members convicted him of the lesser included offense of attempted burglary. The appellant claims the evidence is factually insufficient to support his conviction. We disagree.

Spellman testified she did not know the appellant was going to pay her a visit on the night of January 28. When the appellant was discovered at her patio door, inside his windbreaker he had a pellet gun, modeled after a .45 semi-automatic pistol, and a hunting knife, which he dropped while being searched. The appellant had purchased both items less than four hours earlier, and their packaging was still in his car parked around the corner. According to the responding security policeman, the first thing the appellant asked when confronted was whether he could "get his tools." The security policeman then found a screen from Spellman's bathroom window on the ground several feet away, on which were screwdrivers and a flashlight belonging to the appellant.

According to the appellant, Spellman, vengeful over his decision not to leave his wife, "set him up." The appellant testified he bought the pellet gun (but forgot to buy pellets) and the knife for protection against some large dogs that lived near property he owned and was clearing for house construction. He said he had been to this property before going to Spellman's, and forgot he was still carrying the pellet gun and the knife when he arrived. According to the appellant, Spellman had called him the day before and invited him over. He had declined, saying that he had been ordered to stay away. She insisted, and he told her he already had plans but would come the next night; which he did.

The appellant testified that because of the order, he parked around the corner from Spellman's house. He said he then walked to

her front door and rang the bell. According to the appellant, Spellman looked out a small window and motioned him to the back of the house. Then, according to the appellant, he noticed something in the yard and walked toward it. About that time, the patio light went out, so he stopped. He saw a person coming around the side of the house, and he realized it was a security policeman. He said he heard Spellman yell, "Oh, my God!" and that is when the security policeman saw him. The appellant denied asking the security policeman if he could pick up his tools. According to the appellant, the bathroom screen had come off the previous month and had not been reattached. The flashlight and screwdrivers belonged to him, but he had previously left them with Spellman. The defense counsel implied in closing argument that Spellman had placed them on the screen before he had arrived, and she had unscrewed the light bulb while he was in the back yard.

 Under our statutory mandate, we may not approve a finding of guilty unless we find it correct in law and fact. Article 66(c), UCMJ. This means we must be convinced beyond a reasonable doubt of guilt in order to affirm a conviction, making allowances for not having personally observed the witnesses. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). In the appellant's case, the members were presented precisely the same frame-up theory that we are now asked to accept. On the attempted burglary issue, this was a case of Spellman's credibility versus the appellant's. After having observed the witnesses' demeanor as they gave their conflicting accounts, the members believed Spellman and rejected the appellant's testimony. The emphasized portion of Spellman's cross-examination quoted by the dissent was not missed by the members. Following her cross-examination, a court member asked that she clarify her testimony that she "probably" expected the appellant's visit. Spellman explained that she had based her answer on the appellant's past practices, not on any phone calls. The members were convinced beyond a reasonable doubt the appellant tried to break into Spellman's house, uninvited, with the intent to at least menace her with the .45 look-

alike or the knife. After carefully examining the evidence of record, we are also convinced of this. We resolve this issue against the appellant.

## ALLEGED UNLAWFUL COMMAND INTERFERENCE BY THE BASE SJA

In an affidavit submitted over 10 months after the appellant's trial, Major Wells, the appellant's trial defense counsel, wrote the following:

Three incidents occurred during Sgt Hill's trial which I believe had the potential of detrimentally affecting the accused's right to participate in his own defense and assist his counsel. First, Sgt Hill was prevented from accompanying his attorneys to the alleged crime scene, on orders from the Staff Judge Advocate, Lt Col Holland. Prior to the Article 32 hearing in this case, I and Mr. Ben Hilbun, Sgt Hill's civilian attorney at the time, desired to view the rear of SSgt Spellman's on-base home, which is where Sgt Hill was apprehended, with Sgt Hill present to answer any questions we might have. To this point, we had only seen photographs of the house. After coordinating the visit through the legal office, Mr. Hilbun and I received permission from SSgt Spellman to view the outside of her home while she was at work. Sgt Hill, who was still in pretrial confinement status, was being escorted everywhere by an armed security policeman. Upon being told by Mr. Hilbun and myself that we wanted Sgt Hill, and his armed escort, to accompany us to the rear of SSgt Spellman's house, Lt Col Holland stated Sgt Hill would be allowed to ride to SSgt Spellman's home in a security police cruiser, but that he would not be permitted to get out of the car; Sgt Hill would be required to remain in the police cruiser at the front of the alleged victim's house while his attorneys surveyed the scene at the rear of the house. Considering this case would definitely involve a credibility battle between Sgt Hill and SSgt Spellman, and that the photographs we had already viewed seemed to raise several factual questions concerning the commis-

sion of the alleged crime (i.e., could Sgt Hill have actually fit through the bathroom window), Mr. Hilbun and I felt it important to have our client there with us to answer questions and describe events that transpired the night he was appended. We expressed to Lt Col Holland our reasons for wanting Sgt Hill at the rear of the house with us, and our disagreement with his edict, however Lt Col Holland refused to reconsider his decision. Mr. Hilbun and I subsequently drove to SSgt Spellman's house, where we met Sgt Hill and his security police escort. Mr. Hilbun and I surveyed the exterior of the house, including the rear, and made numerous trips to the parked police cruiser to ask Sgt Hill various questions. At no time during this visit was Sgt Hill permitted to leave the car or accompany his attorneys around the alleged crime scene.

Citing *United States v. Stombaugh*, 40 M.J. 208 (C.M.A.1994), the appellant claims unlawful command influence. He says that his presence at the scene was "absolutely critical" to the development of the defense case, that the SJA's action prevented the defense from conclusively establishing the appellant could not fit through the bathroom window.

If the affidavit is accurate as to the SJA's order, we strongly recommend more sensitivity to legitimate defense preparation needs in the future. But in fairness to the SJA, there may be more to it than revealed in this single affidavit, and the perceived impact of the order on trial preparation may have heightened with memory. This possibility is strengthened by the defense counsel's failure to seek remedial action in the face of the alleged order. Mr. Hilbun and Major Wells sat through the Article 32, UCMJ, investigation without raising the issue. More importantly, Major Wells and Mr. Myers, Mr. Hilbun's replacement civilian defense counsel, sat throughout the entire trial without so much as a word about it, although several other pretrial issues were vigorously contested. We have little doubt the military judge could have—and would have—remedied the perceived preparation problem, had he been told about it. Finally, Major Wells did not raise the issue in post-trial submissions to the convening authority, who could have set aside the findings of guilt for any reason. Article 60(c)(3)(A), UCMJ. Instead, the issue reared its head for the first time almost a year after the trial.

■ By casting the issue as one of command influence, the appellant perhaps seeks to avoid the forfeiture rule. *See United States v. Hamilton*, 41 M.J. 32 (C.M.A.1994). But we reject this analysis. Call it what you may, the crux of the appellant's complaint is that he was hamstrung in his trial preparation because he was forbidden to leave the security police car to visit the crime scene with his lawyers. It was, under R.C.M. 906(a), a perceived wrong capable of being remedied by a motion to the military judge for appropriate relief. The Rule states: "A motion for appropriate relief is a request for a ruling to cure a defect which deprives a party of a right or hinders a party from preparing for trial or presenting its case." In the absence of plain error, the appellant has, by not raising this issue before the court-martial adjourned, forfeited the issue at the appellate level. R.C.M. 905(e); *see United States v. Webber*, 42 M.J. 675 (A.F.Ct. Crim.App.) (defense counsel cannot complain of a wrong and then sit back and do nothing to remedy the situation), *pet. denied*, 43 M.J. 416 (1995). We do not find plain error. The issue has not, therefore, been preserved for appellate review.

### REMAINING ISSUES

■ We reject the appellant's contention that the military judge's reasonable doubt instruction was erroneous. *United States v. Meeks*, 41 M.J. 150, 157–58 n. 2 (C.M.A.1994). We likewise reject the appellant's claim that substantial flaws exist in the Addendum to the Staff Judge Advocate's Recommendation. The Addendum did not misinform the convening authority concerning the defense post-trial submissions, and it did not contain new matter. R.C.M. 1106(f)(7). Finally, we deny the appellant's petition for a new trial based on newly discovered evidence of Spellman's credibility. Spellman's general denial concerning adultery and bearing the appellant's child, signed by Spellman's attorney as

an answer to the plaintiff's petition in Mrs. Hill's alienation of affections lawsuit (and filed with the county clerk the day *before* the appellant's trial began), does not constitute newly discovered evidence of Spellman's credibility. R.C.M. 1210.

The findings and the sentence are correct in law and fact and are

AFFIRMED.

Senior Judges HEIMBURG, PEARSON, SCHREIER and Judges GAMBOA, MORGAN, C.H., II, SENANDER and MORGAN, J.H. concur.

DIXON, Chief Judge (dissenting):

I will not stretch facts nor will I bend the law to sustain a conviction. That is not what our judicial mandate requires nor what justice demands. Yet, that is exactly what I believe the majority has done on this occasion. After closely examining this case, I simply cannot concur that the findings are *correct in law and fact.* In my view, at least two of appellant's assignments of error have merit. First, I find that the evidence is both legally and factually insufficient to convict appellant of attempted burglary. Secondly, I agree with appellant's claim that the no contact order given him by SSgt Lindley was an unlawful order. Accordingly, I would set aside appellant's conviction and dismiss the charges.

I readily admit that appellant's behavior on the evening of 28 January 1995 was somewhat suspicious. Therefore, it is quite easy to speculate that he may have possessed an ulterior motive or entertained some secret criminal design when he was discovered outside the quarters of his long time paramour. However, our responsibility under Article 66, UCMJ, is not to explain appellant's behavior, but rather to determine the correctness of his conviction and to ensure that justice is done.

I feel strongly that the military justice system and this Court have failed this appellant and I write this dissent to preclude having my silence interpreted as acquiescence. When cases are reviewed under our statutory mandate, there is nothing that requires us to give any deference to the finders of fact and we need not begin our review with any presumption that the conviction is correct. We are obligated only to apply established law and to make decisions in accordance with the dictates of our own conscience. We deal in facts and law. These are areas in which reasonable men may disagree. *See United States v. Robertson,* 37 M.J. 432 (C.M.A.1993). In this case, I fear the majority has applied a presumption of correctness and, without closely examining the evidence, merely deferred to the finding reached by the members regarding the attempted burglary.

My dissent is directed first at what it means to be convinced beyond a reasonable doubt. That is the highest standard of proof which the law ever demands. It contemplates proof to an evidentiary certainty. In the case of the attempted burglary conviction, I find such proof woefully lacking. With all due respect to my colleagues in the majority, I simply cannot see how, taking all of the evidence and even viewing it in the light most favorable to the government, *anyone* could conclude beyond a reasonable doubt that appellant committed an *attempted burglary.*[1]

Before discussing the evidence, let me review the relationship between appellant and the person whose residence he was convicted of trying to burglarize. Appellant and Staff Sergeant (SSgt) Spellman met in November 1989 while both were stationed at Columbus Air Force Base in Mississippi. Appellant had spent his entire military career at Columbus and was married in 1983 prior to his entry into the Air Force. SSgt Spellman knew that appellant was married when she met him. Soon thereafter they began a sex-

---

1. Even the lesser included offense of unlawful entry would be a stretch in this situation. You would still have to be convinced that appellant removed the screen that evening. And, of course, you would also have to be convinced that he removed the screen from a small window located more than 5 feet from the ground for the purpose of attempting to gain entry into the house. The difficulty of anyone being able to enter the house through that window speaks for itself.

ual relationship which resulted in SSgt Spellman's pregnancy. By mutual agreement this pregnancy was prematurely terminated.

Shortly after the first pregnancy was terminated, the couple decided that they did want to have a child together. SSgt Spellman became pregnant a second time and their son was born in 1991. Appellant was present at the birth. The couple saw each other on a regular basis throughout their five year relationship. They lunched together almost every day and they took trips [2] together. Appellant was a regular visitor to her on-base quarters. He planted the flower garden in front of her house, built the swing outside her front door, made repairs around the house, and operated very much as if he were living in the quarters with SSgt Spellman and his son.

SSgt Spellman wanted appellant to divorce his wife and marry her. Taking advantage of her assignment within the Personnel Office, she gained access to appellant's personnel records. Learning that appellant also had a child from his marriage at approximately the same time as her son was born, she angrily confronted appellant with the information she had discovered. However, their relationship continued. SSgt Spellman admitted having sexual intercourse with appellant on 21 January 1995 and the next day he washed his truck and her car in her driveway. There is no evidence that SSgt Spellman ever told appellant she did not want to see him again, no evidence she ever told him she was afraid of him, and no evidence she told him to stay away from her quarters.

On 23 January 1995, SSgt Spellman contacted her First Sergeant, told him that she was having problems in her relationship with appellant, that he had twisted her arm during an argument, and that she was concerned about some threats he had made to her. The First Sergeant contacted the Security Police and reported that SSgt Spellman had been involved in an incident with appellant.

That same day, SSgt Lindley, a security police investigator, called appellant in for questioning. After being advised that he was being investigated for assault and disobeying a lawful order,[3] appellant voluntarily made a written statement. He admitted having a relationship with SSgt Spellman which had continued since sometime around November 1989. Appellant denied having ever assaulted her and denied having made any threats to harm her. At the end of the interview, SSgt Lindley ordered appellant "not to contact Sergeant Spellman either at her home, her duty section or even be within 100 feet of her."

The case against the appellant began with the unsubstantiated complaints made by SSgt Spellman that he had assaulted her. The court-martial charges contained three specifications of assault and two specifications of communicating threats. At trial, she testified that, on 23 January 1995, appellant grabbed her arm and twisted it in front of her during an argument. She also recalled other occasions in which appellant either assaulted her or threatened her. One of the incidents occurred in November 1991 and she related an incident which occurred "sometime last year" when appellant allegedly indicated that if he ever saw her with someone else he would get a high powered rifle, take her to a swamp in Noxubee County and leave her there. She stated none of the alleged assaults resulted in bruises and she never required medical treatment. Despite SSgt Spellman's testimony, appellant was acquitted of all specifications of assault and communicating threats.

Now, let's look at the evidence which the government relies upon to show an attempted burglary. On the evening of 28 January 1995, SSgt Spellman called the security police to her on-base quarters stating that the light on her back patio was out. Technical Sergeant (TSgt) Pugh, a security policeman, responded some 10 to 15 minutes later. He

---

2. Their most recent trip together was in December 1994, between Christmas and New Year's day, when they traveled to visit appellant's hospitalized father in Mississippi and then to Florida to visit SSgt Spellman's parents in Pensacola, Florida.

3. SSgt Lindley presumably was under the erroneous belief that appellant previously had been ordered to have no contact with SSgt Spellman.

went to the rear of SSgt Spellman's quarters where he confronted appellant who was walking toward the rear door. TSgt Pugh ordered him to freeze and appellant immediately stopped walking. Appellant was apprehended in possession of a pellet gun. TSgt Pugh testified that appellant was wearing gloves. TSgt Pugh discovered four screwdrivers and a flashlight lying on a window screen on the ground under the bathroom window. He also discovered a sheathed knife which had fallen to the ground at the time appellant was apprehended. Examining the back patio light, TSgt Pugh found that he only needed to tighten it to make it come on.

Appellant's car was located on the street a short distance away from SSgt Spellman's quarters. Inside the car were the original box and the plastic "bubble pack" for the hunting knife and pellet gun. A receipt was found inside a bag which indicated that the knife and pellet gun had been purchased at approximately 5 o'clock that same day.

Appellant testified he had purchased the knife and pellet gun at Wal–Mart and planned to use them while cleaning the property upon which he intended to build a home. He stated that after purchasing these items he went to his property and worked there until it became pretty dark. He claims to have removed the items from their wrapping at his property and was still carrying them when he went to SSgt Spellman's home later that evening. Appellant conceded that the screwdrivers which were admitted into evidence were his but stated they had been left at SSgt Spellman's house when he had repaired her door on 21 January. He maintained that SSgt Spellman had called him and asked him to come to her house so they could talk.

There was testimony from Special Agent Gottwald, Office of Special Investigations, concerning what he observed during daylight when, pursuant to his own investigation, he visited SSgt Spellman's quarters on 29 January. Inspecting the bathroom window which had the missing screen, he noted minute scratches on the frame but was unable to

determine their age or significance. He stated he did not observe any cuts in any of the other screens and was not able to determine when the screen was removed from the bathroom window. TSgt Pugh likewise testified he failed to note any cuts in the screens at the time appellant was apprehended. A couple of days later, SSgt Spellman made a service call to the civil engineers to come out to her quarters to replace the missing screen as well as the screens to her bedroom windows which she said had 6 to 8 inch cuts in them.

Are these facts enough for a reasonable trier of fact to find appellant guilty of attempted burglary beyond a reasonable doubt? *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). I don't think so. Perhaps if the facts were different, if the accused were a known burglar, or if it could be proved when the screen was removed, then arguably there would be enough. Perhaps if appellant had not been a regular visitor to this house and there were no logical reason why the accused's screwdrivers would be found there, then we might have a different situation. However, under the circumstances of this case, finding guilt beyond a reasonable doubt is just too much of a stretch!

This appellant was no stranger to these quarters. He practically lived there. He obviously knew every nook and cranny. That any burglar would choose the small bathroom window as the point of attempted entry would be difficult to imagine. It defies all logic to conclude that this appellant would have chosen that location. Common sense suggests that he would have needed a ladder had that been his intent. An examination of Defense Exhibit C raises a question as to whether it even would have been physically possible for appellant to have entered through the window.[4] Finally, there is no reliable evidence which indicates when the screen to the bathroom window was removed. SSgt Spellman could not dispute appellant's claim that he observed the screen was missing sometime in December of 1994. Apart from the screen being on the ground,

---

4. SSgt Spellman admitted in her Article 32 testimony that appellant could not have entered

through the bathroom window because of his size.

there was nothing which indicated any attempt by anyone to break into SSgt Spellman's home.

Even if you could somehow be convinced that appellant attempted to break into SSgt Spellman's quarters on the evening of 28 January 1995, one could do no more than speculate from the evidence presented at trial that he had an intent to commit some offense like assault. What evidence even suggests he bore the intent to commit an assault or some other crime? Does possession of a pellet gun and a sheathed knife prove an intent to assault? Do allegations of other charged assaults notwithstanding appellant's acquittal suggest an intent to assault on this occasion? Had appellant given SSgt Spellman or anyone else reason to believe that he came to the quarters to harm her? I believe a reasonable factfinder would answer each of these questions in the negative.

Given this couple's continuous relationship, is it at all surprising that appellant would want to see SSgt Spellman on the evening of 28 January? Again, there is no evidence that she told him she did not want to see him or that she did not want him to visit her anymore. Nor is there any indication she asked for anyone's assistance in keeping appellant away from her. Would anyone suggest appellant only visited SSgt Spellman pursuant to invitations? After all, he regularly visited her and his son there for years. SSgt Spellman's own testimony is enough to raise a reasonable doubt regarding why appellant was at her quarters and why his tools were found outside the quarters. A particularly enlightening portion of the cross-examination of SSgt Spellman reads as follows:

Q: When did you conclude, ma'am, that you were never going to end up with this man?

A: Two years, two and a half years, into the relationship.

Q: Two and a half years into the relationship. And you continued until the eleventh hour having sex with him, taking trips with him. Where were you last New Year's eve?

A: In Pensacola, Florida.

Q: With whom?

A: With him, Sergeant Hill.

Q: What you want these triers of fact to believe is that two and a half years ago you recognized this relationship was going nowhere. Is that correct?

A: Yes.

Q: What evidence is there of that? Can you tell us what you did to demonstrate that?

A: To demonstrate that it was going nowhere?

Q: Yes.

A: There were times that I told him that I didn't want the relationship anymore. As a matter of fact, I did it more than once. A couple, three times. He got upset about it. He always told me things were gonna change.

Q: And you let him back in your life?

A: Yes.

Q: So you didn't believe that too strongly did you?

A: No.

Q: And then the night of 28 January, you knew that he was ordered not to come to your home, didn't you?

A: Yes.

Q: But you called him that week, didn't you.

A. No.

Q: And you asked him to come to your home on Friday night, didn't you?

A: No, I didn't.

Q: And he couldn't come Friday night could he?

A:. I didn't ask him to come, I don't know.

Q: But you knew because he couldn't come on Friday, he was going to come on Saturday. Isn't that correct?

A: *Probably. I guess.* [Emphasis added]

Q: Now the screwdrivers, he fixed your side door with those screwdrivers, didn't he?

A: Yes.[5]

Q: And he left them at your home?

A: No, as far as I know, I was in the living room when he got up and left and he was checking the door and I was sitting in the living room. I thought he left and went and got tools. I'm sure he did because he said there was nothing in my house to fix them. [sic] He said he had tools on the back of his truck. He went and got them and fixed it and took them back and came back in.

Q: You don't know if he took the screwdrivers back, do you?

A: He went outside, I don't know what he did with them.

Q: You don't know if he left them in your home, do you?

A: No. He went outside. I assumed he took them back.

This colloquy suggests that appellant's visit to these quarters was not totally unexpected and provides a logical explanation for the presence of the screwdrivers at the quarters. It might be possible to read a sinister motive in the fact that appellant was carrying an unloaded pellet gun and a sheathed knife which he had recently purchased, but in my view mere possession of these items falls far short of proving an intent to assault.

Our obligation as an appellate court extends beyond finding the evidence legally sufficient. To approve appellant's conviction, we ourselves must be convinced beyond a reasonable doubt of his guilt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). I only know there is no way this judge could find appellant guilty of an attempted burglary beyond a reasonable doubt on the evidence presented. There are enough facts to allow me to speculate. Perhaps there is enough evidence to raise a suspicion. I could certainly make assumptions about his intent. But mere speculation, suspicion, and assumptions are not sufficient to convince me beyond a reasonable doubt.

How does the majority opinion justify upholding the conviction of attempted burglary in the face of such meager evidence? It contends that this is "a case of Spellman's credibility versus the appellant's." While this rationale may sound good, it simply doesn't make sense. The fallacy in the majority's rationale lies in the fact that Spellman's testimony fails to provide even a prima facie case of attempted burglary. Unlike the charges of assault which were preferred against the appellant based solely on SSgt Spellman's testimony, the burglary offense does not hinge on whose testimony was more believable. There's simply no proof.

Under our system of justice, you can't convict someone unless there is proof beyond a reasonable doubt on each of the elements of the offense charged even if you find an accused's explanations lack credibility. When a building burns down, you can't simply charge someone with arson, and uphold a conviction, merely because the factfinders did not believe the accused's denial of any involvement. To uphold the conviction, there must be proof that he set the fire. In this case, regardless of who you believe, the proof is lacking.

I can find no support in the record of trial for the statement in the lead opinion that the appellant or his counsel implied that Spellman had placed his tools on the screen before he arrived, and she had unscrewed the light bulb while he was in the backyard. Appellant never accused SSgt Spellman of doing these things. I don't find the suggestion that SSgt Spellman may have set him up totally unbelievable. On the other hand, I don't have to buy in to his account fully in order to find the evidence insufficient.

Particularly troubling to me is the fact that SSgt Spellman's version of the story defies simple logic. She says she called the police because she noticed her back patio light was out. Common sense suggests that an on-base resident would not call the security police merely because a patio light was out. She testified she was not afraid and was inside the house when TSgt Pugh arrived. Yet, TSgt Pugh testified when he arrived "she was outside her quarters" and he indicated she was "very shaken" and "on the verge of tears." Finally, what was appellant doing when he was first seen by SSgt Spell-

---

**5.** Other testimony establishes that this incident took place on 21 January 1995.

man and TSgt Pugh? Was he fleeing? No. Was he standing beside a window with his tools in his hands? No. Both SSgt Spellman and TSgt Pugh testified he was approaching the patio door where SSgt Spellman was standing. Nothing in his actions or his behavior even remotely suggested that he was there to burglarize the house.

There are a lot of possibilities which would explain appellant's presence outside of SSgt Spellman's quarters on the evening of 28 January. It is just possible that he was there, as he claims, because she called him to come over. Maybe, in light of their lengthy relationship, he thought she would want to see him. Maybe he was there to apologize to her. Perhaps he just wanted to see his son. Perhaps he was there to vandalize her quarters so that she would be afraid. Perhaps he was there to spy on her to see if she was seeing someone else. Conceivably even, he was there to break into her house and assault her. All of these possibilities have one thing in common: they are premised on pure speculation. Proof beyond a reasonable doubt would remove all reasonable possibilities except that for which he was convicted. Unfortunately, there are just too many pieces of the puzzle missing to give us a clear picture.

If I could vote to uphold this conviction based on the *possibility* that appellant was engaged in an attempted burglary, I could easily do so. If I only had to be satisfied that appellant was *probably* attempting a burglary, I would ponder my decision on his guilt. But since I must use the *beyond a reasonable doubt* standard, I do not hesitate to dissent. Maybe my standard for "beyond a reasonable doubt" is just too high. I only know that I am not "firmly convinced" that appellant made any attempt to unlawfully enter SSgt Spellman's quarters. If "beyond a reasonable doubt" means what I think it does, this conviction should be overturned. In my view, justice demands it.

I am no less disturbed by this Court's decision to affirm appellant's conviction of violating the lawful order of an NCO by going to SSgt Spellman's quarters on that evening. SSgt Lindley testified that he ordered appellant "not to contact Sergeant Spellman either at home, her duty section or even be within 100 feet of her." It is absolutely clear that appellant knew that his presence contravened the order issued to him by SSgt Lindley. Nevertheless, he attacked the lawfulness of the order at trial. Prior to arraignment, defense counsel moved to dismiss the disobedience charge arguing that (1) SSgt Lindley was not in appellant's chain of command, (2) the order was not given pursuant to Security Police duties, and (3) it was overly broad because it was not limited in time. The majority holds that the defense *limited* its attack on the legality of the order to SSgt Lindley status *vis-a-vis* the appellant.[6] I can find no support for such a narrow holding. I can scarcely imagine a broader attack on the lawfulness of an order. As a minimum, the defense questioned (1) whether anyone outside appellant's chain could issue this order, (2) whether the order was in furtherance of security police duties, and (3) whether the order was illegal because it was not limited in time.

Since the reasonableness of this order depends upon factual determinations, the military judge appropriately denied appellant's motion to dismiss. But, for reasons I cannot comprehend, the military judge found that the order given by SSgt Lindley was a legal order as a matter of law. In so doing, I believe he erred.[7] His precipitous ruling precluded the defense from contesting the lawfulness of the order before the members. Moreover, it relieved the government of its burden of proving beyond a reasonable doubt one of the essential elements of the offense, namely that appellant had a duty to obey the order. Counsel for appellant expressed his disagreement with the judge's ruling and entered a "not guilty" plea to the charge in order to preserve the issue for appellate review. In his instructions on findings, the

---

6. I cannot follow the majority's logic that appellant "was not challenging the terms of the order; he was only challenging who gave it." When does a not guilty plea ever limit the attack? A plea of not guilty concedes nothing and means that the government must prove every element of an offense.

7. Plain and simply, this ruling was tantamount to a finding of guilty.

military judge advised the members that he had determined that the order was lawful as a matter of law. In my view, the military judge materially prejudiced the appellant by his ruling and subsequent instruction.

My earlier expressed belief that the system had failed this appellant certainly applies to how this offense was judicially handled. The majority concludes that "there was no factual dispute regarding the issue" and "both sides saw the matter as purely a legal issue." In their words "once the judge determined the source of the order passed legal muster, there was nothing for the members to decide concerning lawfulness." The majority presumably overlooks the importance of factual determinations in deciding the lawfulness of orders. *See United States v. McShane*, 28 M.J. 1036 (A.F.C.M.R.1989). I just can't see that appellant got his "day in court" on this charge. When he pleads not guilty, he is entitled to have the members determine his guilt. He never requested a trial by judge alone, yet the military judge was the sole arbiter of the only issue in dispute. I can find no precedent which would condone this result. *See Unger v. Ziemniak*, 27 M.J. 349 (C.M.A.1989) (holding where reasonableness of an order is in issue, military judge should submit the issue to the members).

Arguably, this charge never should have been referred to trial. I certainly cannot ignore the fact that the pretrial investigating officer concluded this was an unlawful order and recommended that this charge be dismissed. With regard to whether there were factual issues in this case, he observed:

A factual issue exist [sic] in regards to whether SSgt Lindley was properly in the performance of his duty as a security policeman when he gave the accused the order. Thus, an issue also arises as to whether the accused had a duty to obey this order and whether the order expired on 28 January 1995.

In his discussion of the issues, he indicated:

The law requires an order to relate to military duty, and it should not interfere with private rights or personal affairs of the accused. MCM, 1984, Part IV, Paragraph 14(c). In this case, it appears the order interferes with the accused's right to see his and SSgt Spellman's son, who lives with SSgt Spellman. Another issue relating to the lawfulness of the order is whether SSgt Lindley had authority to issue such an order. An order may be authorized by regulation or custom of the service. *Id.* It is not clear whether a security policeman who happens to be an NCO has authority to issue what is tantamount to a restraining order.

After thoroughly examining this issue, the investigating officer concluded as follows:

I do not believe there is sufficient evidence proving the accused disobeyed a lawful order from an NCO because I believe SSgt Lindley was not in the performance of his duty when he gave the order, or at least he was not properly authorized to give such an order under the circumstances.

I reject the majority's suggestion that appellant's counsel, by moving for a dismissal prior to arraignment, caused the issue to be less than thoroughly developed on the record. If anything hampers our appellate review of this issue, it is the failure of the military judge to explain the basis of his legal ruling. All I can discern from his ruling is that there is an inference of lawfulness when an order is given and that this order is lawful as a matter of law. I can't tell if the military judge viewed the order as lawful because SSgt Lindley was a security policeman or because he outranked appellant. There was no explanation of why he considered this order in furtherance of military duty. If superior rank were the deciding factor, it's entirely possible that this military judge would have upheld the order had SSgt Spellman given it since she also outranked appellant. We just don't know. He seems to suggest that the indefinite duration of the order did not affect its lawfulness because "the alleged violation occurred within one week." Does that mean a military accused is not entitled to have the lawfulness of an order determined at the time of its inception? I certainly hope not. Unfortunately, we just don't know why the military judge found this order lawful as a matter of law.

In some situations, it is appropriate for the military judge to decide the lawfulness of an order as a matter of law. *This was not such a situation.* A military judge may find an order lawful as a matter of law only when such a decision is clear. *See* Dept. of the Army Pamphlet 27–9, *Military Judges' Benchbook*, para. 3–15–2, Note 1 (Sep 96). However, "if there is a factual dispute as to whether the command was lawful, that dispute *must* be resolved by the members in connection with their determination of guilt or innocence." *See id.* at Note 3. (Emphasis added)

Could reasonable men differ about the lawfulness of this order? You bet they could! This is clearly a situation in which the lawfulness of the order necessitates a factual determination. The factual issue is whether the order given by SSgt Lindley relates to a specific military duty and is one which he was authorized to give under the circumstances. There are no reported cases which address the authority of a security policeman or any other non-commissioned officer not in the chain of command to issue a "no-contact" order. There is no precedent which holds that this order was a lawful order as a matter of law. Without question, appellant is entitled to have this issue determined by the triers of fact. In the absence of such a factual determination, I see no way for this Court to conclude that the finding of guilt is correct in law and fact. At the very least, this case should be returned for a rehearing on this factual issue.

But, in my view, the appropriate remedy would be to set aside this conviction and dismiss the charge. Some orders cannot withstand close legal scrutiny. *See United States v. Padgett*, 45 M.J. 520 (C.G.Ct.Crim. App.1996) (finding a "no-contact with a 14–year–old female" order given by a CWO to be overly broad and not in furtherance of a military purpose). This is one of them. The bottom line is that I do not believe a superior NCO or a security policeman, *on the basis of an allegation alone*, can lawfully order an airman to refrain for a period of two and one half months from having any contact with another military member. When you add the fact that the person who this appellant

was ordered to avoid is not only the mother of his child, but a person with whom he has maintained a five-year relationship, the illegality of the order is all the more obvious. The law is clear that, without a valid military purpose, an order may not interfere with the recipient's personal rights and private affairs. MCM, Part IV, Para. 14c(2)(a)(iii); *United States v. Stewart*, 33 M.J. 519, 520 (A.F.C.M.R.1991).

For an order to be lawful, it must be shown to be in furtherance of or connected to military needs. *United States v. Wine*, 28 M.J. 688 (A.F.C.M.R.1989). Unlike the situation in *Wine*, this appellant did not enter a plea of guilty. While the appellant must presume an order to be legal, this Court has no such obligation. *See United States v. Wilson*, 12 U.S.C.M.A. 165, 30 C.M.R. 165, 1961 WL 4416 (1961); *United States v. Stewart*, 33 M.J. 519 (A.F.C.M.R.1991); *United States v. Padgett*.

Orders to refrain from having contact with other individuals have been found lawful in the Air Force when (1) given by someone with command authority and (2) when the need for such an order is factually determined. *United States v. Flynn*, 34 M.J. 1183 (A.F.C.M.R.1992); *United States v. Hawkins*, 30 M.J. 682 (A.F.C.M.R.1990). Neither of these conditions was present in this case. While security policemen may give orders to preserve the integrity of an investigation, even the majority concedes that the order was not given for that purpose in this case. Neither was SSgt Lindley motivated by a desire to stop improper behavior which he personally had observed or which had been substantiated. At best, he was motivated by some altruistic desire to maintain peace in the military community. The majority opinion found his motivation "praiseworthy." Unfortunately, good motives are not enough to make an order lawful. *Stewart*, 33 M.J. at 521; *United States v. Roach*, 26 M.J. 859 (C.G.C.M.R.1988), *aff'd*, 29 M.J. 33 (C.M.A. 1989); *United States v. Wilson*, 12 U.S.C.M.A. 165, 30 C.M.R. 165, 1961 WL 4416 (1961).

The majority opinion totally ignores what is clearly the overriding issue in this case. Nowhere does it say why this is a lawful

order! Is it the prerogative of security policemen or superior NCOs to control the future behavior of other airman? I think not. Can a security policeman apprehend someone for speeding or driving while intoxicated and legally order him not to drive for the rest of his tour? May a superior NCO lawfully order a subordinate not to associate with his friend because he saw the subordinate steal money from the friend's house? I believe the law is clear that these orders would be unlawful. I submit there is nothing different about the order that SSgt Lindley gave and I will not bend the law to find this order lawful.

There are legal and practical reasons for requiring "no contact" orders to originate from command authority. Commanders are responsible for good order and discipline within their organizations and orders of this nature may be justified in appropriate circumstances under a commander's inherent authority. More importantly, commanders are authorized to impose administrative and punitive sanctions. It is particularly revealing that, with full knowledge of the circumstances, appellant's commander took no action in this case.

SSgt Lindley rushed to judgment and, in my opinion, issued an order that was overly broad and not warranted by a military purpose. He had not even talked with SSgt Spellman but rather relied on her written complaint. In the face of total denials by the appellant, he sided with the complainant. In essence, he convicted appellant of misconduct right then and there. Rather than issue an order to preserve the integrity of his investigation, he sought to control appellant's freedom of association for the two and a half months remaining on his tour of service. Moreover, when called to testify, he failed to articulate any reason for giving the order. This Court is left to speculate about its purpose.

I mean to cast no dispersion upon SSgt Lindley for the way he dealt with appellant's situation. I agree with the majority that his motives were admirable. However, it is not his conduct but rather the appellant's conduct which is before this Court. Not only has appellant been charged with, and convicted of, violating a lawful order, inferences have been drawn with respect to the attempted burglary from the fact that the order was given. Had it not been for the overreaching order given by SSgt Lindley, I think it is likely appellant would have completed his ten years in the Air Force without having his record marred by a court-martial conviction. To countenance appellant's conviction of violating an order which seems on its face to be overly broad, which was not warranted by the circumstances, and which was not given in furtherance of a military purpose, in my view, would be a clear injustice.

Finally, I must address and take issue with the majority's conclusion that appellant did not preserve this issue for appellate review. The suggestion that the issue of the lawfulness of this order was not developed at trial and that the appellant has waived our consideration of this issue by changing horses in midstream is blatantly absurd.[8] How else would the majority have expected this accused to preserve the issue of the validity of this order? Appellant moved to have the charge dismissed and filed a brief in support of that motion. Then, when he lost the motion, appellant entered a plea of not guilty for the expressed purpose of preserving the issue.[9] Certainly, the statement by the defense counsel that had appellant's commander given the order it would not have been contested does not waive the issue of whether the order given by SSgt Lindley was lawful. I can think of many orders that a commander lawfully could give that someone outside the chain of command could not.[10]

**8.** Nowhere does the majority make a bigger stretch than by concluding appellant failed to raise this issue at trial. Neither R.C.M 905(e) nor *Folk*, which are cited by the majority, support such a result.

**9.** The record established that appellant was willing to enter a conditional guilty plea but was

thwarted when the government refused to accept a conditional plea.

**10.** Orders to submit to urinalysis or to open one's dormitory room for a health and welfare inspection are but two.

I conclude by reiterating my belief that neither of these findings of guilt are correct in law and fact. For the reasons indicated herein, I believe he has been wrongly convicted.